**MORGAN STANLEY GROUP, INC. and Morgan Stanley & Co. Incorporated, Plaintiffs,**

**v.**

**NEW ENGLAND INSURANCE CO. and ITT New England Management Co., Inc., Defendants.**

**No. 95 CIV. 1728 SHS.**

United States District Court, S.D. New York.

Feb. 16, 1999.

James W.B. Benkard, Davis Polk & Wardwell, New York, NY, for Plaintiffs.

Stephen C. Cunningham, Siff, Rosen & Parker, Louis G. Adolfsen, Melito & Adolfsen, P.C., New York, NY, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEIN, District Judge.

This action was tried to this Court on October 13 and October 14, 1998. After due consideration of the testimony and evidence adduced during that trial, the following are the findings of fact and conclusions of law of this Court:

## I. *Jurisdiction, Venue, and Choice of Law*

The plaintiffs and defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" in this judicial district. Plaintiffs reside in New York and the insurance contract in question was negotiated and delivered in New York. Thus, New York is the state with the greatest interest in this action. Therefore, under New York's choice of law rules, New York law governs this breach of contract action. *See Employers Ins. of Wausau v. Duplan Corp.*, 899 F.Supp. 1112, 1116 (S.D.N.Y.1995).

## II. *Background*

This action stems from events beginning in 1985 when Morgan Stanley Mortgage Capi-

tal, an affiliate of Morgan Stanley Group, Inc., and Morgan Stanley & Co., Incorporated (collectively, "Morgan Stanley") were involved in the sale and purchase of participation interests in a $56 million loan from Siscorp, an Oklahoma corporation, to Fourth and Broadway Associates Ltd., which intended to acquire and renovate a ten-story department store building in downtown Los Angeles with the proceeds. Two purchasers of the participation interests were Whitestone Savings, F.A. ("Whitestone") and The Banking Center ("TBC"), two savings banks located in New York and Connecticut, respectively. Morgan Stanley was involved in Whitestone's purchase of a $10 million participation interest from Siscorp in May 1985 and in TBC's purchase of a $5 million participation interest in August of that same year. The exact nature of Morgan Stanley's involvement in these transactions is the subject of the current dispute.

In the underlying transactions, Siscorp made numerous misrepresentations to Morgan Stanley, to TBC and to Whitestone. The most significant was Siscorp's representation that 30 savings and loan institutions had agreed to repurchase the interest of any investor in the loan at the investor's option after 24 months. In reality, the 30 S & L's had never consented to such an arrangement. Siscorp's misrepresentations were revealed before the loan was fully funded, and, as a result, the Fourth and Broadway project failed. Because of the failure of the investment, Whitestone and TBC filed lawsuits against Morgan Stanley and others involved in the transactions.

In these underlying litigations, Whitestone and TBC claimed, among other things, that Morgan Stanley had committed fraud, had been negligent, and had breached a fiduciary duty by relaying to Whitestone and TBC false and incomplete information concerning the Siscorp investment. Morgan Stanley defended itself in the underlying litigations and ultimately settled both; specifically, in October 1994 it settled with Whitestone for $3.7 million and in January 1997 it settled with TBC for $2.1 million. In addition, Morgan Stanley claims to have incurred more than

$4.3 million in legal fees defending those actions. *See* Joint Pretrial Order at p. 3.

At the time the Whitestone and TBC lawsuits were filed, Morgan Stanley was covered by an "Investment Counselors Errors and Omissions and Fiduciary Liability Insurance" policy provided by defendants in the instant action, New England Insurance Company and ITT New England Management Company, Inc. (collectively, "New England"). The policy provided that New England would indemnify Morgan Stanley for:

> Loss which the Insured shall become legally obligated to pay, from any claim made against the Insured during the Policy Period, by reason of any actual or alleged negligent act, error or omission committed in the scope of the Insured's duties as investment counselors.

Plaintiff's Exhibit 1 at p. 1.

The policy also obligated New England to pay all "[c]osts and expenses incurred in the defense of any claim for which coverage is provided hereinunder." *Id.* Morgan Stanley kept New England abreast of the events in the Whitestone and TBC litigations and gave New England adequate notice of its intent to settle those litigations. After settlement, Morgan Stanley sought payment from New England of its legal expenses and settlement costs. New England refused to pay, claiming that the underlying litigations are not covered by the policy because Morgan Stanley was not acting as an "investment counselor" in the transactions involving Whitestone and TBC. The present litigation, in which Morgan Stanley claims that New England has breached its obligations under the insurance contract by refusing to indemnify Morgan Stanley for the costs associated with the settlement of the Whitestone and TBC claims, ensued.

III. *Conclusions of Law*

A. Standard of Proof for a Settling Insured

 New England claims that the loss incurred by Morgan Stanley is not within the terms of the "Insuring Agreements" section of the policy; it is not asserting that the loss falls within any of the listed "Exclusions" to

the policy. In insurance litigations, where the insurer is claiming that the insured's loss falls outside the terms and conditions of the insurance coverage, the burden of proof rests with the insured to prove that the loss is one covered by the policy. *See Jakobson Shipyard, Inc. v. Aetna Casualty and Surety Co.,* 961 F.2d 387, 389 (2d Cir.1992); *Paul Revere Life Ins. Co. v. Bavaro,* 957 F.Supp. 444, 447 (S.D.N.Y.1997). *Compare Village of Sylvan Beach, New York v. Travelers Indemnity Co.,* 55 F.3d 114, 115 (2d Cir.1995) ("The insurer generally bears the burden of proving that the claim falls within the scope of an exclusion."). Thus, in the present case, Morgan Stanley bears the burden of proving that the loss it incurred by defending and settling the underlying litigations was covered by the insurance policy. *See Jakobson,* 961 F.2d at 389.

Both parties disagree upon what the standard of proof is for an insured that is trying to gain coverage for a settled claim. Morgan Stanley relies upon *Luria Brothers & Co., Inc. v. Alliance Assurance Co., Ltd.,* 780 F.2d 1082 (2d Cir.1986), in asserting the position that all it must prove is that it faced potential liability in the underlying litigation in order to be indemnified. Essentially, relying on *Luria,* Morgan Stanley posits that it only has to prove that it faced liability for actions that could have potentially been characterized as investment counseling. This position is not supported by the applicable law.

■ As all parties agree, the policy does not contain a duty to defend, which would require New England to pay for Morgan Stanley's defense of all colorable claims asserted against Morgan Stanley that could potentially fall within the policy coverage. *See City of Johnstown v. Bankers Standard Ins. Co.,* 877 F.2d 1146, 1148 (2d Cir.1989). Instead, the policy only calls for New England to indemnify Morgan Stanley for claims asserted against Morgan Stanley in its capacity as an investment counselor. Thus, Morgan Stanley must go beyond proving that a mere claim existed; it must also show that

the claim was a covered loss by proving that it was acting as an investment counselor in the transactions which gave rise to the underlying litigation. *See Servidone Const. Corp. v. Security Ins. Co. of Hartford,* 64 N.Y.2d 419, 424, 477 N.E.2d 441, 444, 488 N.Y.S.2d 139, 142 (1985) (discussing the difference between an insurer's duty to defend and an insurer's duty to indemnify the costs of a settling insured); *Burroughs Wellcome Co. v. Commercial Union Ins. Co.,* 713 F.Supp. 694, 699 (S.D.N.Y.1989) ("The duty to indemnify requires a covered loss not merely the 'possibility' of coverage.").

■ As New England correctly argues, *Servidone* and *Luria* can, and should, be read together to establish the standard of proof for a settling insured. Essentially, when dealing with a claim that potentially falls outside the main text of the insurance policy—rather than an exclusion—a two part burden must be born by the insured. First, pursuant to *Servidone,* the insured must prove that the claims asserted against it fell within the scope of the insurance coverage,[1] and second, pursuant to *Luria,* the insured must show that its settlement of these claims was proper by proving that on the facts as known to it at the time of the settlement it faced potential liability. *See Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1379 (E.D.N.Y.1988); *see also Stonewall Ins. Co. v. National Gypsum Co.,* 1992 WL 123144, at *8–9 (S.D.N.Y. May 27, 1992). In *Luria* itself, the Second Circuit implicitly applied this two part test by first determining whether or not the insured faced potential liability which justified the settlement of the underlying action, and then examining the policy language itself to determine if settlement of the underlying action produced a loss that was covered by the policy. *See Luria,* 780 F.2d at 1091–92.

This Court finds, based upon the testimony of Monroe Sonnenborn, Morgan Stanley's in-house counsel, that Morgan Stanley did face potential liability for the claims in question

---

1. In *Servidone,* the insurer bore the burden of proving that the underlying claim fell within one of the exclusions of the insurance coverage. 64 N.Y.2d at 425, 488 N.Y.S.2d 139, 477 N.E.2d 441. This case does not deal with the interpreta-

tion of a policy exclusion; and, therefore, as noted above, the burden of proving that Morgan Stanley's actions constituted investment counseling pursuant to the insurance agreement rests with Morgan Stanley.

and that settlement of those claims was reasonable based upon the facts known to Morgan Stanley at the time it decided to settle. *See* Trial Transcript at 48–49. This fact is further evidenced by the opinion dated March 26, 1996 issued by a magistrate judge in the TBC litigation which recommended a partial denial of Morgan Stanley's motion for summary judgment. Plaintiffs' Exhibit 28. Therefore, because Morgan Stanley has shown that the settlement of the underlying claims was reasonable, to establish that it is entitled to recovery under the insurance contract for the settlement of the underlying litigations, Morgan Stanley must prove that the claims in the underlying litigations arose out of services it performed as an "investment counselor" to Whitestone and TBC.[2]

## B. Interpretation of Insurance Contract Terms

■ When examining an insurance policy, a court must first determine whether the policy is ambiguous. *See United States Fire Ins. Co. v. General Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir.1991). In deciding a motion for summary judgment in this action, this Court determined that the term "investment counselor" in the insurance contract was ambiguous. *See Morgan Stanley Group Inc. v. New England Insurance Co.*, 7 F.Supp.2d at 300, 303.

■ Once a court determines that, as a matter of law, a term of an insurance policy is ambiguous, "it may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Alexander & Alexander Services v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998) (citation omitted); *Hartford Accident & Indemnity Co.*, 33 N.Y.2d 169, 171, 305 N.E.2d 907, 909, 350 N.Y.S.2d 895, 898 (1973). Where extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the contra proferentem rule of contract construction and construe any ambiguities in the contract against the insurer as a matter of law. *See*

*McCostis v. Home Ins. Co. of Ind.*, 31 F.3d 110, 113 (2d Cir.1994); *State v. Home Indemnity Co.*, 66 N.Y.2d 669, 671, 486 N.E.2d 827, 829, 495 N.Y.S.2d 969, 971(1985). However, where the relevant extrinsic evidence offered "raises a question of credibility or presents a choice among reasonable inferences" the construction of the ambiguous terms of the contract is a question of fact which precludes the application of the contra proferentem rule. *Alfin, Inc. v. Pacific Insurance Co.*, 735 F.Supp. 115, 119 (S.D.N.Y.1990). *See Alexander & Alexander*, 136 F.3d at 86; *Home Indemnity*, 66 N.Y.2d at 671, 495 N.Y.S.2d 969, 486 N.E.2d 827.

■ The contra proferentem rule of interpretation is only to be used as a last resort, where no extrinsic evidence can shed light upon the intent of the parties. *See United States Fire Ins. Co. v. General Reinsurance Corp.*, 949 F.2d 569, 573 (2d Cir.1991); *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n. 2 (2d Cir.1983). Application of the rule is inappropriate in the instant case, especially when one considers that both parties are sophisticated financial entities, and that the interpretation of the term put forward by New England is reasonable. *See United States Fire Ins.*, 949 F.2d at 574, *Stonewall Ins. Co.*, 1992 WL 123144, at * 8. In light of this law, the Court renews its conclusion, originally made at the summary judgment stage, that relevant extrinsic evidence exists concerning the intent of the parties when they entered into this contract which precludes the application of the contra proferendum rule. The interpretation of the term "investment counselor" is a question of fact to be decided upon an examination of extrinsic evidence of the parties' intent.

## IV. Findings of Fact

### A. Interpretation of "Investment Counselor"

Morgan Stanley contends that the term "investment counselor" was meant to cover all instances in which Morgan Stanley provided investment advice to a customer, re-

**2.** The Court is not rendering a conclusion on whether the actual settlement amounts were reasonable, but only that settlement itself was rea-

sonable in light of the potential liability faced by Morgan Stanley at the time of settlement.

gardless of the underlying relationship between Morgan Stanley and the customer. New England, however, urges that the term "investment counselor" should be interpreted to cover only those instances in which Morgan Stanley has a contract with a client pursuant to which it provides that client with investment advice for a fee. The extrinsic evidence at trial supports Morgan Stanley's definition of the term.

■ This Court credits the testimony of James Elliott, Morgan Stanley's former Risk and Insurance Manager, who testified that when he made the decision to renew the New England policy he relied upon New England and New England's insurance broker, Marsh & McClennan, when each represented that the term "investment counselor" was to be interpreted broadly and that the insurance contract itself "was a broad form professional liability policy which meant that it would include all activities unless they were specifically excluded within the contract." Trial Transcript at p. 214. Indeed, Morgan Stanley received a letter from Albert Salvatico, at that time an employee of Marsh & McClennan, in which Salvatico wrote: "The term 'investment counseling' is undefined with the basic policy and this is done with the purpose of allowing the policy to be as flexible as possible especially when one considers the wide array of different advisory services that a firm as large as Morgan Stanley can provide." Plaintiff's Exhibit 17.

New England presents little extrinsic evidence to suggest that the term should be interpreted narrowly. Although Bette E. Mahoney, a New England insurance agent involved in the Morgan Stanley transaction, testified that she "assumed" that investment counseling involved providing advice pursuant to a written contract, she also testified that she could not say why the term was undefined within the policy, stating that the decision not to define the term was "a man-

agement decision that was made long before" she worked at New England. See Mahoney dep. at pp. 72–73, 78, & 102–03.[3] New England also highlights the fact that Morgan Stanley initially purchased the policy because it was required to do so by a client that did have a contract with Morgan Stanley for investment advice. This does not prove, however, that the parties intended the contract to cover only that particular client arrangement, especially considering the fact that the policy contains no requirement of a contractual relationship in order for Morgan Stanley to receive coverage.

However, even though the extrinsic evidence points to a broad definition of "investment counselor," the definition has limits. Morgan Stanley does not assert that the term encompasses all of the functions that it performs for clients.[4] The Salvatico letter, discussed above, states that the term investment counselor is meant to encompass instances where Morgan Stanley offers "advisory services," which implies that, to fall within the definition of the term, Morgan Stanley must be providing a client advice. Plaintiff's Exhibit 17. This Court concludes that where Morgan Stanley does not provide an investor with its own, independent advice as to the propriety or soundness of an investment, it is not acting as an "investment counselor" in relation to that investor. An example of activity that does not constitute investment counseling would be where Morgan Stanley acts as the agent of a seller of an investment opportunity and gives a potential buyer only the information that it feels is necessary to induce that buyer to make a purchase. In that situation, Morgan Stanley is not providing that buyer with advice that is based upon Morgan Stanley's independent analysis of the investment, but is merely serving as a conduit by which information concerning the particular investment opportunity is passed from seller to potential buy-

---

**3.** All references to deposition pages are to portions of deposition transcripts which were admitted into evidence during the trial.

**4.** In fact, Morgan Stanley was involved in the sale of a participation interest in the Siscorp loan to a third bank, First Federal of Pontiac ("Pontiac"). In that transaction Morgan Stanley

itself bought the participation interest from Siscorp and sold it directly to Pontiac. Pontiac also initiated a suit against Morgan Stanley that Morgan Stanley settled. Morgan Stanley is not seeking indemnification from New England for expenses associated with that suit. See Trial Transcript at pp. 38–39.

er; such activity cannot be considered "investment counseling" under a reasonable definition of the term.

Accordingly, based upon the extrinsic evidence this Court finds that the term "investment counselor" here was meant to encompass instances in which Morgan Stanley engaged in an independent analysis of an investment and provided that analysis to a customer, regardless of whether Morgan Stanley had a contract with that entity to provide advice. It is now necessary to examine Morgan Stanley's actions in the underlying transactions to determine if it was acting as an investment counselor.

### B. Morgan Stanley's Actions in the Underlying Transactions

Morgan Stanley did not have a contractual relationship with either Whitestone or TBC in the underlying transactions and the evidence supports the conclusion that Morgan Stanley was acting as an agent for Siscorp. Sonnenborn testified upon direct examination that Morgan Stanley's role in the underlying transaction was to act as "an agent or broker" in moving the participation interests from Siscorp to the banks. See Trial Transcript at p. 40. Moreover, in the TBC litigation, Morgan Stanley did not dispute the fact that it "acted as Siscorp's agent in presenting the loan participation" to TBC. Plaintiff's Exhibit 28 at p. 10. Morgan Stanley did write a letter to Whitestone in which it claimed to be acting as Whitestone's agent, but Sonnenborn testified that this was an "erroneous characterization by Morgan Stanley of its status with Whitestone" and Gerald Slattery testified that "in hindsight" the letter expressed a "misunderstanding between Whitestone and Morgan Stanley." Trial Transcript at p. 56; Slattery dep., March 11, 1988, at p. 388. Morgan Stanley's payment for brokering the underlying transaction came directly from Siscorp in the form of an "agency fee," portions of which it eventually transferred to TBC and Whitestone. See Defendant's Exhibit A at p. 74; Trial Transcript at p. 41.

As Morgan Stanley itself contended in the underlying litigations, this fee arrangement suggests that Morgan Stanley was acting as an agent for Siscorp and not for Whitestone and TBC. The Court places very little credence upon Morgan Stanley's current position—i.e., that Whitestone and TBC were entitled to the entire fee and they allowed Morgan Stanley to keep a portion of it—because that position is the converse of their position in the underlying litigations and is not consistent with the fact that the payments flowed from Siscorp to Morgan Stanley, which then allocated a portion of the money to Whitestone and TBC.

 Even though Morgan Stanley was acting as agent for Siscorp in the underlying transactions, under the definition of "investment counselor" outlined above, it is possible that Morgan Stanley was acting as an "investment counselor" to TBC and Whitestone as well if it was providing them with advice that it obtained through its analysis of the investment. In making this factual determination, the Court must look at the information that Morgan Stanley provided to TBC and Whitestone in the underlying transactions. Specifically, the Court must determine: 1) what type of information Morgan Stanley provided the banks; 2) what steps Morgan Stanley took to obtain and verify this information; and 3) why Morgan Stanley provided the banks with this information. Upon an analysis of the trial testimony, including the deposition testimony submitted in the course of the trial, Morgan Stanley has not proven by a preponderance of the evidence that it was acting as an "investment counselor" by providing Whitestone and TBC with investment advice in the underlying transactions.

Michael E. Bruno, a vice president in Morgan Stanley's institutional sales department, and Franzine Mozer, a sales professional at Morgan Stanley, handled the Whitestone and TBC transactions, respectively.[5] Bruno and

---

5. The parties also submitted deposition testimony from the underlying litigations of officers of both Whitestone and TBC. The bank officers primarily testified as to what Morgan Stanley's role was in the underlying transactions. This testimony is less probative than the testimony of Morgan Stanley's employees on the issue of what Morgan Stanley actually did in the underlying transac-

Mozer each testified in both the underlying litigations between Morgan Stanley and the banks and in this litigation. The Court places little weight upon their testimony here. Even though both Bruno and Mozer characterize themselves as salespeople rather than advisors or bankers, Bruno dep., April 10, 1997, at p. 16; Mozer dep., April 25, 1997, at p. 7, each witness states, in a general fashion, that the providing of investment advice or investment counseling was an integral part of their jobs as salespeople and that they were providing that type of service for TBC and Whitestone in the underlying transactions.

Bruno testified that, around the time of the underlying transactions, he considered his job to consist of providing the institutional accounts with "advice on market conditions, [and] counseling on various security transactions that would meet their investment needs." Bruno dep., Apr. 10, 1997, at p. 15. Mozer testified more specifically that she believed she provided TBC with "investment advice" which constituted "bringing the investment to them and determining that it was an appropriate investment, providing the product." Mozer dep., Apr. 25, 1997, at p. 46. The Court has not been provided with any deposition testimony taken in this litigation—rather than in the underlying Whitestone and TBC litigations—that reveals the specific information that Bruno and Mozer provided to Whitestone and TBC in relation to the underlying transactions, how they obtained information, or the purpose for which information, if any, was provided to the banks. Only Mozer's testimony concerning her initial telephone call to TBC about the investment in which she "read a sales and product description" to the TBC representative indicates the information that was provided to the banks by Morgan Stanley. See Mozer dep., Apr. 25, 1997, at p. 23. Because that description contained information provided by Siscorp, Mozer's reliance upon it supports the position that Morgan Stanley was not acting as an "investment counselor" in the underlying transactions.

The deposition testimony of Bruno and Mozer given in the underlying litigations, however, is substantially more revealing about the information that Morgan Stanley was providing to the banks. Bruno testified that he was not acting as an "investment advisor" in the underlying transaction and that he did not represent to Whitestone that the underlying investment was sound because he did not "know" the investment. See Bruno dep. Jan. 8, 1998, at pp. 368–69. He also testified that, "as a salesman," he rarely engaged in his own analysis of a deal before presenting it to a client. See id. at p. 246. He believed his role in relation to Whitestone was to merely present it with investments that he felt fit its portfolio, and that it was Whitestone's obligation to perform its own due diligence in order to confirm the soundness of any particular investment. See id. at p. 368. He testified that he did not expect Whitestone to rely upon himself or Morgan Stanley concerning the Siscorp investment: "They [Whitestone] have to go out and inspect that property or do their own due diligence before taking it." Id. at p. 245.

Mozer's prior testimony also contradicts her testimony in this case when she states that her function in relation to the sale of investments, such as the participation interest here, was to "show investments to customers that have the beginnings of something that may be of interest to them." Mozer dep., Mar. 16, 1988, at p. 122. She testified that: "Morgan Stanley only presents [investments such as this one] to the customer if its fits [the customer's] parameters and interests," and that she did not think that Morgan Stanley made an assessment as to the "soundness" of such investments. Id. She went so far as to testify that, although she was unsure whether Morgan Stanley would independently investigate the investments, she did not "anticipate or believe" that Morgan Stanley would "undertake any investigation at any time with respect to any term of [the] participation interest." Id. at p. 112. Even though she was the salesperson that presented the investment to TBC, she testified that she never spoke with

tions. The Court also placed little weight upon the expert deposition testimony that was presented concerning Morgan Stanley's role and did not

regard the testimony provided by New England's only live witness, Richard Ellwood, as probative on the ultimate issue in this case.

anyone at Siscorp about the investment. *Id.* at p. 114

The fact that Morgan Stanley was not acting as an investment counselor in the underlying transactions is further supported by the allegations in the underlying litigations themselves. Many of the representations that Siscorp made about the loan participations were false or misleading. The fact that Morgan Stanley passed this false or misleading information on to Whitestone and TBC supports the view that it did not engage in an independent analysis of the investment. Any information that it provided was not its own investment advice provided to the banks in its capacity as an "investment counselor" because Morgan Stanley was merely acting as a conduit, receiving information, on face value, from Siscorp and forwarding it to the banks.

Sonnenborn testified that Morgan Stanley's defense in the underlying transactions was that it was not providing Whitestone and TBC with investment advice. *See* Trial Transcript at p. 152. To counter this earlier position, Morgan Stanley now contends that any time it brings an investment to the attention of a commercial entity it can be considered to be giving advice to that entity. Morgan Stanley asserts that, because of its reputation in the financial community, associating itself with an investment is like "sprinkling holy water" on it, which in turn leads purchasers to believe that the investment is safe. *See id.* As Sonnenborn testified:

Q: You didn't think that Morgan Stanley was advising these people, did you? Yes or no.

A: Ultimately, yes.

Q: So would you say that whenever Morgan Stanley deals with a commercial entity and they make allegations because of Morgan Stanley sprinkling holy water on something and Morgan Stanley recommends that they buy it, Morgan Stanley is advising them? Is that it? Yes or no.

A: Yes

Q: And that is the capacity that we are talking about here, that was the ad-

vice? That is what you mean by advice, correct?

A: Yes.

*Id.* Under this theory, any time that Morgan Stanley presented an investment to a potential customer, even if Morgan Stanley did not investigate the investment and did not provide the customer with any information concerning the investment, Morgan Stanley could be considered an "investment counselor"; this is not a reasonable interpretation of the term.

The sum of the testimony is that Morgan Stanley was not acting as an "investment counselor" to these banks. Morgan Stanley was, as Sonnenborn himself testified, "an intermediary between moving the participation from Siscorp to the ultimate holders [TBC] and Whitestone," Trial Transcript at p. 40, and was not performing an independent advisory function. In the underlying transactions, Morgan Stanley was acting as Siscorp's agent in an effort to sell participation interests on Siscorp's behalf. While Morgan Stanley was aware of the investment needs of both Whitestone and TBC, its goal was to try to present them with investments that it believed would fit the banks' portfolios in order to facilitate sales to them. Morgan Stanley did give the banks limited information about the Siscorp transaction, but this information was not "advice" in that it was not information that Morgan Stanley obtained through its own investigation of the investment. Essentially, Morgan Stanley only acted as a conduit through which information about the investment was passed from Siscorp to the banks in an effort to persuade the banks to buy.

V. *Conclusion*

Morgan Stanley bears the burden of proving that it acted as an "investment counselor" in its dealings with Whitestone and TBC in order to gain indemnity from New England for the costs of settling the lawsuits with those banks. After reviewing all the relevant evidence, this Court concludes that Morgan Stanley was not acting as an "investment counselor" in the underlying transactions, and therefore New England did not breach the terms of its insurance policy with Morgan

Stanley by refusing to pay the settlement costs of the underlying litigations.

Accordingly, the Clerk of Court is directed to enter judgment for defendants.

SO ORDERED: