225 F.3d 270 (2nd Cir. 2000)
 MORGAN STANLEY GROUP INC. and MORGAN STANLEY & CO. INCORPORATED, Plaintiffs-Appellants-Cross-Appellees,
v.
NEW ENGLAND INSURANCE CO. and ITT NEW ENGLAND MANAGEMENT CO., INC., Defendants-Appellees-Cross-Appellants.
 Docket Nos. 99-7304(L), 99-7324(XAP)
No. 592 -- August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: December 16, 1999
Decided: September 12, 2000
 
 Appeal from a judgment of the United States District Court for the Southern District of New York (Stein, J.) dismissing policyholder's indemnification claims in respect of two settlements. Affirmed in part (as to one claim), and (as to the other claim) vacated and remanded for further proceedings consistent with this opinion.
 On the insurer's cross-appeal from a summary judgment order declaring that the later (less exhausted) of two insurance policies provides coverage for any successful indemnification claim, vacated and remanded for further proceedings consistent with this opinion. [Copyrighted Material Omitted]
 JAMES W.B. BENKARD, New York, NY (Nancy B. Ludmerer, James C. Maroulis, Davis Polk & Wardwell, New York, NY, on the brief), for Plaintiffs-Appellants-Cross-Appellees.
 LOUIS G. ADOLFSEN, New York, NY (S. Dwight Stephens, Melito & Adolfsen P.C., New York, NY, on the brief), for Defendants-Appellees-Cross-Appellants.
 Before: MESKILL, JACOBS and LEVAL, Circuit Judges.
 Judge Meskill concurs in part and dissents in part in a separate opinion.
 JACOBS, Circuit Judge:
 
 
 1
 Beginning in 1984, New England Insurance Co. and ITT New England Management Co., Inc. (collectively, "New England") issued and renewed policies of insurance to Morgan Stanley Group, Inc. and Morgan Stanley & Co., Inc. (collectively, "Morgan Stanley"), providing claims-made coverage for "investment counselors errors and omissions." The borrower and two purchasers of participation interests in a failed real estate loan sued Morgan Stanley for its role in promoting the transactions. Morgan Stanley gave notice of one claim in 1986, and of two others in 1987. After settling the two 1987 claims, Morgan Stanley demanded indemnification from New England under its 1987 policy. New England declined coverage.
 
 
 2
 Morgan Stanley commenced this diversity action in the United States District Court for the Southern District of New York (Stein, J.). Among other defensive positions, New England contended that Morgan Stanley's role in the transactions was not as an investment counselor, and that the notice of the 1986 claim amounted to notice of circumstances giving rise to the 1987 claims as well (so that the largely-exhausted 1986 policy would respond (to the extent of limits remaining) to any coverage owed in respect of the 1987 claims).
 
 
 3
 The district court (i) initially granted summary judgment in favor of Morgan Stanley declaring that the 1987 policy would respond if Morgan Stanley was entitled to any indemnification; and (ii) later granted judgment, after a bench trial, dismissing Morgan Stanley's complaint on the ground that the loss did not arise from Morgan Stanley's role as an investment counselor.
 
 
 4
 On appeal, Morgan Stanley points to two provisions in the insurance contracts that Morgan Stanley characterizes as ambiguous and contends should be construed in its favor under the doctrine of contra proferentem.
 
 
 5
 New England cross-appeals, arguing that any recovery on Morgan Stanley's indemnification claims should be charged against the 1986 policy.
 
 
 6
 As to one of the claims for indemnification, we affirm judgment in favor of New England; as to the other, we vacate the judgment and remand for further proceedings consistent with this opinion. As to the cross-appeal, we vacate the district court's decision that the 1987 insurance policy responds in coverage and remand for further fact-finding.
 
 BACKGROUND
 A. The Insurance Policies
 
 7
 New England's claims-made errors and omissions ("E&O") policies indemnify for "[l]oss which the Insured shall become legally obligated to pay, from any claim made against the Insured during the Policy Period, by reason of any actual or alleged negligent act, error or omission committed in the scope of the Insured's duties as investment counselors." The term "investment counselors" is undefined. The insurer has no duty or right to defend, but must reimburse "[c]osts and expenses incurred in the defense of any claim for which coverage is provided hereunder."
 
 
 8
 The coverage was issued for policy year 1984 and was renewed annually without relevant modification. The two policies at issue in this appeal are: FW000186, for policy period March 5, 1986 to March 5, 1987 (the "1986 policy"); and FW000262, for policy period March 5, 1987 to March 5, 1988 (the "1987 policy").
 
 B. The Underlying Claims
 
 9
 In 1985, Fourth and Broadway Associates, Ltd. ("Fourth & Broadway") secured a loan commitment for funds it planned to use to acquire and renovate a commercial building in downtown Los Angeles. Savings Investment Service Corp. ("Siscorp") made the loan commitment and sold participation interests in it to other financial institutions. Morgan Stanley presented that investment opportunity to Whitestone Savings, F.A. ("Whitestone") and The Banking Center ("TBC") (collectively, the "banks"). Whitestone eventually purchased a $10 million participation interest from Siscorp, and TBC purchased a $5 million interest.
 
 
 10
 Several material misrepresentations by Siscorp came to light before the participation interests were fully sold, as a result of which the loan could not be funded, and the Fourth & Broadway project failed.
 
 
 11
 In 1987, Whitestone and TBC filed separate lawsuits against Morgan Stanley alleging that Morgan Stanley provided false and incomplete information about the investment. The banks alleged, inter alia, negligence and fraud. Whitestone also alleged breach of fiduciary duty. TBC's claim alleged in addition that Morgan Stanley represented, contrary to fact, that TBC's $5 million participation interest was purchased from a separate $12 million participation interest acquired by Morgan Stanley for its own account, rather than directly from Siscorp.
 
 
 12
 Following substantial discovery, and a denial of Morgan Stanley's motion for summary judgment in the TBC action, Morgan Stanley settled with Whitestone for $3.7 million and with TBC for $2.1 million.
 
 C. The Coverage Dispute
 
 13
 After settling with the banks, Morgan Stanley sought indemnification from New England for the amount of the settlements, as well as $4.3 million in legal defense costs. Morgan Stanley contended that it had acted as an "investment counselor" to the banks in connection with the failed Fourth & Broadway loan and that the losses were therefore covered under the 1987 policy. New England disclaimed coverage.
 
 
 14
 In this ensuing breach of contract suit, the parties advance competing interpretations of the insurance policy's coverage clause. The terms of their controversy is neatly summarized by Judge Stein:
 
 
 15
 Morgan Stanley contends that the term "investment counselor" was meant to cover all instances in which Morgan Stanley provided investment advice to a customer, regardless of the underlying relationship between Morgan Stanley and the customer. New England, however, urges that the term "investment counselor" should be interpreted to cover only those instances in which Morgan Stanley has a contract with a client pursuant to which it provides that client with investment advice for a fee.
 
 
 16
 Morgan Stanley Group v. New England Ins. Co., 36 F. Supp. 2d 605, 609-10 (S.D.N.Y. 1999) ("Morgan Stanley II"). The district court held that the policy was ambiguous because the term was susceptible of at least the two reasonable interpretations offered by the parties. See Morgan Stanley Group v. New England Ins. Co., 7 F. Supp. 2d 297, 300 (S.D.N.Y. 1998) ("Morgan Stanley I"). The court therefore denied the parties' cross-motions for summary judgment and their subsequent motions for reconsideration. See id. at 300, 301.
 
 
 17
 The parties also cross-moved for an order declaring which of the two policies would respond to Morgan Stanley's claims (if covered). New England contended that the loss (if any) should be charged against the 1986 policy; Morgan Stanley argued for coverage under the 1987 policy. This matters financially because a large unrelated loss has reduced the remaining limits of the 1986 policy, whereas the 1987 limits ($5 million excess of $1 million deductible per act or set of interrelated acts, $3 million aggregate deductible) are largely intact. The district court agreed with Morgan Stanley and concluded that the 1987 policy would respond to the claims if they are covered. See Morgan Stanley I, 7 F. Supp. 2d at 301.
 
 
 18
 The court conducted a two-day bench trial in which it heard extrinsic evidence as to what the parties meant by the term "investment counselors." The court (i) rejected New England's interpretation as overly narrow, (ii) rejected Morgan Stanley's interpretation as overly broad, and (iii) construed the term "investment counselors" to include only "instances in which Morgan Stanley engaged in an independent analysis of an investment and provided that analysis to a customer." Morgan Stanley II, 36 F. Supp. 2d at 611. Because the court found that Morgan Stanley adduced no evidence that it had made such an independent analysis of the Fourth & Broadway loan, the court granted judgment in favor of New England. See id. at 611-14.
 
 DISCUSSION
 I. The Appeal
 
 19
 Morgan Stanley posits two ambiguities in the insurance contracts. First, the term "investment counselors" is subject to competing, reasonable interpretations. Second, although the policy is clear that there is coverage for errors and omissions whether actual or alleged, and that there is coverage for such acts or omissions when Morgan Stanley actually acts as an investment counselor, it is unclear whether there is also coverage when Morgan Stanley is alleged to have acted in that role when in fact it has not. We conclude that (1) although the term "investment counselors" potentially describes a range of financial services, Morgan Stanley failed to carry its burden of showing that the role it performed in connection with the sale of the Siscorp participations was within that range; and (2) whether or not the policies afford coverage for claims that allege (even contrary to fact) that the errors or omissions were committed by the policyholder as an investment counselor, Morgan Stanley failed to carry its burden of showing that the allegations contained in the TBC complaint allege that Morgan Stanley acted in the role of investment counselor, as that term can reasonably be understood, but (3) because the Whitestone complaint alleges (contrary to fact) that Morgan Stanley acted in the role of investment counselor, and because the policies can arguably be read to afford coverage on that ground, we think that the district court in the first instance should resolve that ambiguity. Accordingly, we affirm the grant of summary judgment in favor of New England with respect to the TBC claim, but with respect to the Whitestone claim we vacate and remand for further proceedings consistent with this opinion.
 
 A. Applicable Law
 
 20
 Under New York law, "an insurance contract is interpreted to give effect to the intent of the parties as expressed in the clear language of the contract." Village of Sylvan Beach v. Travelers Indem. Co., 55 F.3d 114, 115 (2d Cir. 1995). "[T]he initial interpretation of a contract 'is a matter of law for the court to decide.'" K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996)). Part of this threshold interpretation is the question of whether the terms of the insurance contract are ambiguous. See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998). An ambiguity exists where the terms of an insurance contract could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997) (citation and internal quotation marks omitted). Once a court concludes that an insurance provision is ambiguous, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Alexander & Alexander, 136 F.3d at 86; accord Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428-29 (2d Cir. 1992). "If the extrinsic evidence does not yield a conclusive answer as to the parties' intent," a court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy "any ambiguity in [the] ... policy should be resolved in favor of the insured." McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994).
 
 
 21
 B. The Meaning of "Investment Counselor"
 
 
 22
 Applying these principles, the district court concluded that the parties' different interpretations of "investment counselor" raised an ambiguity that precluded summary judgment and required consideration of any extrinsic evidence. The evidence adduced at trial convinced the court that New England's interpretation--based on whether or not a fee was paid for the service--was unsound and too narrow, and (at the same time) that Morgan Stanley's interpretation was too broad. Instead, the court found that the hallmark of investment counseling is independent analysis and, because Morgan Stanley proffered no evidence of having conducted independent analysis, the district court entered judgment in favor of New England.
 
 
 23
 We take a slightly different approach, but arrive at the same result. It is well established under New York law that a policyholder bears the burden of showing that the insurance contract covers the loss. See, e.g., Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co., 961 F.2d 387, 389 (2d Cir. 1992); Paul Revere Life Ins. Co. v. Bavaro, 957 F. Supp. 444, 447 (S.D.N.Y. 1997); Chase Manhattan Bank, N.A. v. Travelers Group, Inc., 702 N.Y.S.2d 60, 61 (1st Dep't 2000); Munzer v. St. Paul Fire & Marine Ins. Co., 538 N.Y.S.2d 633, 636 (3d Dep't 1989).[1] If the court concludes that an insurance policy is ambiguous, then the burden shifts to the insurer to prove that its interpretation is correct: if extrinsic evidence is available but inconclusive, the burden shifts at the trial stage, see Union Ins. Soc'y v. William Gluckin & Co., 353 F.2d 946, 951-52 (2d Cir. 1965) (remanding for trial in order to allow district court to consider extrinsic evidence before applying contra proferentem); in the absence of extrinsic evidence, the burden shifts at the summary judgment stage, see Twombly v. AIG Life Ins. Co., 199 F.3d 20, 25-26 (1st Cir. 1999).
 
 
 24
 "The fact . . . that terms of a policy of insurance may be construed as ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the purview of such terms." 2 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 21:14 (1997). If the insurance contract cannot reasonably be construed to cover the claim, regardless of which interpretation may have been intended, then the policyholder has not met its burden of proving that it suffered a covered loss. See Phillips v. Government Employees Ins. Co., 395 F.2d 166, 168-69 (6th Cir. 1968). As a matter of law, an ambiguity is insufficient to shift the burden to an insurer if the possible range of meanings does not extend far enough to cover the particular loss.
 
 
 25
 Morgan Stanley failed to carry its burden. The term "investment counselors" is vague within certain parameters, but it does not render this policy ambiguous for purposes of this suit because no interpretation of "investment counselors" within the range of reasonable meanings would extend coverage for the particular conduct underlying the Whitestone and TBC settlements. "[E]ven a vague clause may be ambiguous only at its edges." United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993); accord K. Bell & Assocs., 97 F.3d at 639.
 
 
 26
 The district court found that: "Morgan Stanley was acting as an agent for Siscorp" in the underlying transactions, Morgan Stanley II, 36 F. Supp. 2d at 611; after Whitestone and TBC purchased participation interests in the Fourth & Broadway loan, Siscorp paid Morgan Stanley an "agency fee," id.; Morgan Stanley had no contractual relationship with Whitestone or TBC, and received no fee from the banks for its services, see id.; and Morgan Stanley's purpose was to "facilitate sales" of the participation interests, id. at 613. In short, Morgan Stanley was pitching to potential buyers as an agent for a seller. No reasonable person would believe that errors or omissions in this marketing activity were "committed in the scope of the Insured's duties as investment counselors."
 
 
 27
 A "counselor" is one who gives advice, regardless of whether a fee is paid; thus legal counsel usually involves a retainer, while pastoral counseling does not. In most instances, counseling can be distinguished conceptually and functionally from the recommendations of one who is a seller or the disclosed agent of a seller. A car salesman may offer a potential customer an opinion on the car's reliability, but no one could deem the dealer sufficiently disinterested to be a "counselor," and the advice, which cannot reliably be assumed to have been offered for the good of the buyer, is no counsel.
 
 
 28
 It does not matter that Morgan Stanley pitched the Fourth & Broadway investment to Whitestone and TBC because Morgan Stanley believed the investment fit the portfolios of those banks. Identification of likely customers and prospects is an aspect of its role as Siscorp's selling agent. To hold that Morgan Stanley acted as an investment counselor in this case would transform every effective salesman into an investment counselor.
 
 C. The Allegation of Investment Counseling
 
 29
 To recapitulate: the insurance contract indemnifies for any "[l]oss which the Insured shall become legally obligated to pay, from any claim made against the Insured during the Policy Period, by reason of any actual or alleged negligent act, error or omission committed in the scope of the Insured's duties as investment counselors" (emphasis added). New England construes its policy to cover losses arising from errors or omissions (actual or alleged) committed while the policyholder is actually acting in the role of an investment counselor; Morgan Stanley construes the policy to cover losses arising from such errors or omissions committed while the policyholder is actually or allegedly acting in the role of an investment counselor.
 
 
 30
 The district court initially adopted Morgan Stanley's construction in the opinion that denied New England's motion for summary judgment. See Morgan Stanley I, 7 F. Supp. 2d at 299. However, the district court rejected this argument without comment in its second opinion, which granted judgment in favor of New England. See Morgan Stanley II, 36 F. Supp. 2d at 609 ("Morgan Stanley must prove that the claims in the underlying litigations arose out of services it performed as an 'investment counselor' to Whitestone and TBC."). Because (i) the policy is ambiguous with respect to covered allegations and (ii) the district court failed to consider this ambiguity when examining the extrinsic evidence of the parties' intent, we vacate the judgment in favor of New England and remand for further proceedings consistent with this opinion. For the reasons stated below, our vacatur is limited to the claim arising out of the Whitestone lawsuit.
 
 
 31
 Both parties have offered reasonable interpretations of the coverage clause. Morgan Stanley's interpretation is perhaps surprising in its breadth, but we cannot say on this record that it is unreasonable. In rejecting Morgan Stanley's reading, the district court relied on the distinction between the duty to defend and the duty to indemnify the costs of a settling insured. See Morgan Stanley II, 36 F. Supp. 2d at 608 (citing Servidone Constr. Corp. v. Security Ins. Co., 488 N.Y.S.2d 139 (1985)). Generally, the duty to defend is broader than the duty to indemnify. See Servidone, 488 N.Y.S.2d at 142. But it is undisputed that this insurance policy imposes no duty to defend, so that distinction is irrelevant here.
 
 
 32
 If in fact the parties intended the coverage clause to cover claims in which the error or omission is alleged to have been committed while the policyholder acted in a role that as described would make the policyholder an investment counselor (regardless of the policyholder's actual role in the transaction), that intention is binding. "Where . . . the duty to indemnify arises out of contract instead of as a matter of law, 'the question of whether actual liability is a prerequisite to the duty to indemnify is answered by reference to what the parties, by virtue of their contractual capacity, intended, as reflected in the language of the indemnity clause.'" Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1094 (1st Cir. 1989) (quoting Bainville v. Hess Oil V.I. Corp., 837 F.2d 128, 131 (3d Cir. 1988)).
 
 1. The TBC Claim
 
 33
 For reasons stated above, a contract may be ambiguous when applied to one set of facts but not another. Therefore, ambiguity is detected claim by claim. See supra Part I.B. We affirm the dismissal of Morgan Stanley's claim for indemnification in respect of the TBC complaint because even if the policy covers claims in which the error or omission is alleged to have been committed while the policyholder acted in a role that as described would make the policyholder an investment counselor (regardless of the policyholder's actual role in the transaction), no reasonable reading of the TBC complaint could support Morgan Stanley's claim for indemnification. TBC alleged that Morgan Stanley: (i) "[a]t all times relevant herein . . . was acting with the authority and consent of Siscorp," (ii) "was retained by Siscorp for the purpose of selling all or part of the . . . participations for Siscorp," (iii) purchased for itself a $12 million participation interest from Siscorp, (iv) purported to sell $5 million of its interest to TBC, and (v) actually arranged for TBC to buy a $5 million interest from Siscorp. Under no reasonable meaning of the term "investment counselor," see supra Part I.B, can these allegations be read to allege conduct that is "committed in the scope of the Insured's duties as investment counselors." The complaint alleges that Morgan Stanley was acting as a seller's paid agent while holding itself out as the principal in the sales transaction. The point is that neither role is that of an investment counselor.
 
 
 34
 Morgan Stanley has failed to demonstrate coverage or to raise an ambiguity capable of sustaining coverage. See Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co., 961 F.2d 387, 389 (2d Cir. 1992). Accordingly, we affirm the entry of judgment in favor of New England with respect to the TBC claim.
 
 2. The Whitestone Claim
 
 35
 Like TBC, Whitestone alleged that Morgan Stanley acted as Siscorp's agent and received an agency fee. Unlike TBC, Whitestone alleged that it "was not aware that Morgan Stanley was acting as broker and/or agent for SISCORP." Rather, Whitestone alleged that it believed Morgan Stanley "was acting as an agent of Whitestone and by virtue of that relationship was a fiduciary owing a duty of loyalty to Whitestone," and that Morgan Stanley "undertook to provide to Whitestone certain services, including, inter alia, to act as Whitestone's agent and to analyze whether purchasing a participation interest in the Construction Loan was a sound and prudent investment." Evidence available to Whitestone included a letter signed by Morgan Stanley, which stated that Morgan Stanley was "acting as agent for Whitestone Savings in connection with the sale by Siscorp of participation interests" in the Fourth & Broadway loan.
 
 
 36
 These allegations describe Morgan Stanley as Whitestone's investment counselor in the transaction. If an allegation is enough to establish Morgan Stanley's role as investment counselor within the meaning of the policy, the Whitestone loss (absent any other valid coverage defense) would be a covered loss. But we cannot decide whether the allegation is enough on this appeal because the district court did not resolve this ambiguity in the course of its bench trial. See Union Ins. Soc'y v. William Gluckin & Co., 353 F.2d 946, 952 (2d Cir. 1965) ("[S]ound judicial administration strongly suggests that a court should not attempt to reconstruct the intent of the parties in a complicated factual situation before they have had an opportunity to present evidence on that issue before the fact-trier."). The district court's analysis of the extrinsic evidence admitted at trial was limited to the meaning of "investment counselor." We therefore vacate the portion of the judgment relating to the Whitestone claim, and remand for further fact-finding as to the parties' intent.
 
 D. Considerations on Remand
 
 37
 The district court articulated the principles of New York law applicable to resolving ambiguities in insurance contracts:
 
 
 38
 Once a court determines that, as a matter of law, a term of an insurance policy is ambiguous, "it may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Where extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the contra proferentem rule of contract construction and construe any ambiguities in the contract against the insurer as a matter of law. However, where the relevant extrinsic evidence offered "raises a question of credibility or presents a choice among reasonable inferences" the construction of the ambiguous terms of the contract is a question of fact which precludes the application of the contra proferentem rule.
 
 
 39
 Morgan Stanley II, 36 F. Supp. 2d at 609 (citations omitted). In applying these principles, the district court did not apply contra proferentem in Morgan Stanley's favor, partly because "both parties are sophisticated financial entities." Id. However, there is no general rule in New York denying sophisticated businesses the benefit of contra proferentem. See, e.g., Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1533-34, 1544 (2d Cir. 1997); Westchester Resco Co. v. New England Reins. Corp., 818 F.2d 2, 3 (2d Cir. 1987) (per curiam); see also 2 Couch on Insurance 3d § 22:24 ("Avoidance of the rule . . . is not required merely because an insured party is a business rather than an individual."). This is not a case between two insurance companies, see United States Fire Ins. Co. v. General Reins. Corp., 949 F.2d 569, 573-74 (2d Cir. 1991), nor a case where the policyholder is "akin to . . . an insurance company" because of its sophistication in matters of insurance coverage, Loblaw, Inc. v. Employers' Liab. Assurance Corp., 446 N.Y.S.2d 743, 745 (4th Dep't 1981).
 
 
 40
 It is unsettled in New York whether contra proferentem applies if the policyholder is a sophisticated entity that negotiated contract terms. See Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10 n.2 (2d Cir. 1983) (noting that the issue remains unresolved); see also Pittsdon Co. Ultramar Am. Ltd. v. Allianz Ins. Co., 124 F.3d 508, 521 (3d Cir. 1997) (refusing, under New Jersey law, to apply contra proferentem on behalf of a sophisticated insured who negotiated the insurance contact); 2 Couch on Insurance 3d § 22:24 (noting that the rule might not apply if a sophisticated insured "fully negotiated the insurance contract"). But we need not decide this issue because Morgan Stanley (although sophisticated) did not negotiate its coverage terms. A New England insurance agent who participated in the insurance transaction testified that it was a "standard policy" that New England "didn't amend for anybody."
 
 
 41
 Therefore, if on remand the extrinsic evidence sheds no light on the second ambiguity or "does not yield a conclusive answer," the district court should apply contra proferentem. McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994).
 
 II. The Cross-Appeal
 
 42
 New England cross-appeals from the order of the district court holding that Morgan Stanley's claims, if indemnifiable, are indemnified under the 1987 policy. The contracts at issue are claims-made insurance policies, and the issue turns on whether notice was given in the 1986 policy period or in the 1987 policy period. The relevant policy clause, Paragraph 5(b), is identical in the 1986 and 1987 policies, and provides in pertinent part:
 
 5. NOTICE OF LOSS OR CIRCUMSTANCES:
 
 43
 The insured shall, as a condition precedent to any right to coverage under this Insurance, give to the Company immediate notice in writing
 
 
 44
 . . .
 
 
 45
 (b) of any circumstances which may subsequently give rise to a claim for which coverage is provided hereunder. If any claim for which coverage is provided hereunder is subsequently made against the Insured arising out of the circumstances reported under this subdivision (b), it shall be deemed to have been made during the Policy Period . . . .
 
 
 46
 The relevant factual circumstances are undisputed: (i) during the 1986 policy period, Morgan Stanley gave notice of a lawsuit filed against it by Fourth & Broadway in connection with the failed Fourth & Broadway loan and misrepresentations by Siscorp, and (ii) during the 1987 policy period, Morgan Stanley gave notice of the Whitestone and TBC claims. New England argues that the 1986 notice constitutes notice of "circumstances which may subsequently give rise to" a covered claim, and that the TBC and Whitestone claims, if covered, are such claims. New England therefore contends that, pursuant to paragraph 5(b) of the 1986 policy, the 1986 policy would respond to the TBC and Whitestone claims (if covered), rather than the 1987 policy.
 
 
 47
 The district court concluded instead that Morgan Stanley could seek indemnification under the 1987 policy because, by its plain language, the policy provided coverage for claims made during its policy period, as the Whitestone and TBC claims were. "The fact that a provision in a prior policy [paragraph 5(b) of the 1986 policy] may provide for coverage when the circumstances giving rise to a claim were brought to the insurer's attention during that prior policy period does not alter the plain language of [the 1987 policy]." Morgan Stanley I, 7 F. Supp. 2d at 301.
 
 
 48
 The court erred by analyzing the policies as separate, independent contracts. By renewal or other means of extension, this claims-made insurance is a perennial contract that includes an arrangement for allocating claims to particular policy years.
 
 
 49
 In somewhat different contexts, New York law is that "[a]n agreement to renew a policy[] implies that the terms of the existing policy are to be continued . . . in the absence of evidence[] that a change was intended." Hay v. Star Fire Ins. Co., 77 N.Y. 235, 239 (1879); accord L. Lewitt & Co. v. Jewelers' Safety Fund Soc'y, 249 N.Y. 217, 222 (1928); Walton v. Sterling Fire Ins. Co., 197 N.Y.S.2d 277, 280 (4th Dep't 1960); Collis v. Massachusetts Bonding & Ins. Co., 260 N.Y.S. 241, 242 (4th Dep't 1932), aff'd, 264 N.Y. 447 (1934) (per curiam); cf. Jacobson v. Equitable Life Assur. Soc., 42 N.Y.S.2d 696, 697-98 (1st Dep't 1943) (denying insured's disability claim under a renewed policy because insured had already received and exhausted coverage for the disability under the initial policy). It seems undisputed on this record that the 1987 policy, as it indicates on its face, is a renewal of the 1986 policy.[2] The 1987 policy is therefore "merely a continuation or extension of the original contract," continued in force and without interruption. 2 Couch on Insurance 3d § 29:35 (citing Collis, 260 N.Y.S. at 242).
 
 
 50
 Over successive policy years, New England's investment counselor E&O policy, as renewed each year, operates reciprocally to compartmentalize each timely reported loss into one or another policy period. See 1 Allan D. Windt, Insurance Claims & Disputes § 1.07, at 29 (3d ed. 1995) (describing provisions similar to paragraph 5(b) as "standard" in claims-made insurance policies). Thus the mandatory language of paragraph 5(b) of the 1986 policy--that claims arising from previously reported circumstances "shall be deemed to have been made during the Policy Period" of the policy in effect at the time of the reporting--continued in effect during the 1987 policy (and any subsequent renewals of the insurance policy). If Morgan Stanley were correct that each renewal contract must be construed separately, as if the preceding and successive policies did not exist, it would be child's play for a policyholder to double its coverage limits on large losses by sending notice in one policy year of circumstances potentially giving rise to a subsequent claim (to trigger coverage in that policy period), and by sending notice of the subsequent claim in a subsequent policy period (to trigger coverage in that second, subsequent policy period).
 
 
 51
 Morgan Stanley may not seek indemnity under the 1987 policy if, pursuant to paragraph 5(b) as it appears in each policy, notice of circumstances giving rise to the Whitestone claim is considered to have been made during the 1986 policy period. Because the district court did not determine whether the notice of the Fourth & Broadway claim given in 1986 operated as notice of the Whitestone claim as well, we remand for further fact-finding on this issue. If Morgan Stanley's 1986 notice amounted to notice of the circumstances that gave rise to the subsequent lawsuit, Morgan Stanley's recovery is limited to the coverage remaining under the 1986 policy. If not, then paragraph 5(b) does not operate, and Morgan Stanley may seek indemnity under the 1987 policy. Accordingly, we vacate the district court's declaration that the 1987 policy responds, and remand for further fact-finding.
 
 CONCLUSION
 
 52
 With respect to the TBC claim, the judgment in favor of New England is affirmed. With respect to the Whitestone claim, we vacate (1) the judgment in favor of New England and (2) the district court's decision that the 1987 policy supplies coverage for any successful claims, and we remand for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 An insurer bears the burden of proof when it claims that an exclusion in the policy applies to an otherwise covered loss. See Village of Sylvan Beach, 55 F.3d at 115.
 
 
 [2]
 The "Investment Counselors Rating Sheet" accompanying the 1987 policy classifies it as a renewal, as does the "Renewal Proposal Form" submitted by each of the three named insureds. James Elliott, Morgan Stanley's former Risk & Insurance Manager, acknowledged at trial that the 1987 policy was a renewal of the policy that was in place since 1984.
 
 
 
 53
 MESKILL, Circuit Judge, concurring in part and dissenting in part from majority opinion:
 
 
 54
 I concur in the majority opinion except with respect to section I.B, from which I dissent.
 
 
 55
 The majority admits that "investment counselors" is ambiguous, i.e., "vague within certain parameters," but holds as a matter of law that investment counseling does not encompass "pitching to potential buyers as an agent for a seller." In so holding, the majority makes the same error made by the district court -- it adopts an interpretation of an ambiguous contract term that is entirely unsupported by evidence of the parties' intent.
 
 
 56
 Indeed, after a bench trial, the district court found to the contrary that "[t]he extrinsic evidence at trial supports Morgan Stanley's definition of the term." Morgan Stanley Group v. New England Ins. Co., 36 F.Supp.2d 605, 610 (S.D.N.Y. 1999) (Morgan Stanley II). The court credited the testimony of James Elliott, Morgan Stanley's former Risk & Insurance Manager, who testified that he relied on New England and insurance broker Marsh & McClennan when each represented that "the term 'investment counselor' was to be interpreted broadly and that the insurance contract itself 'was a broad form professional liability policy which meant that it would include all activities unless they were specifically excluded within the contract.'" Id. The court also quoted a letter sent to Morgan Stanley by Albert Salvatico, then an employee of Marsh & McClennan, in which he wrote: "The term 'investment counseling' is undefined with the basic policy and this is done with the purpose of allowing the policy to be as flexible as possible especially when one considers the wide array of different advisory services that a firm as large as Morgan Stanley can provide." Id. In short, there is simply no extrinsic evidence to support the majority's interpretation of "investment counselors," but there is ample evidence to suggest that the term should be "interpreted broadly" in order to "allow[] the policy to be as flexible as possible."
 
 
 57
 The majority, undeterred by the lack of supporting evidence, nevertheless opines that "counselor" unambiguously and as a matter of law does not include "one who is... the disclosed agent of a seller." I do not think that the term must be read so narrowly as a matter of law, and neither did the district court: "Even though Morgan Stanley was acting as agent for Siscorp in the underlying transactions... it is possible that Morgan Stanley was acting as an 'investment counselor' to TBC and Whitestone as well." Id. at 611. As the majority notes, "[a] 'counselor' is one who gives advice, regardless of whether a fee is paid." Whether or not Morgan Stanley was acting as an agent, it was undeniably giving advice. Again, I rely on findings of the district court, which suggest that Morgan Stanley did not present the Siscorp investment indiscriminately to potential investors, but rather presented the investment to Whitestone and TBC because it believed that the investment would suit them. Specifically, the district court found that "Morgan Stanley was aware of the investment needs of both Whitestone and TBC" and that "its goal was to try to present them with investments that it believed would fit the banks' portfolios." Id. at 613; see also id. at 612 (Morgan Stanley's role was to present Whitestone "with investmentsthat... fit its portfolio."); id. ("Morgan Stanley only presents [investments such as this one] to the customer if it fits [the customer's] parameters and interests." (alterations in original) (internal quotation marks omitted)). The district court went on to say that Morgan Stanley did so in order "to facilitate sales," but regardless of motive the point remains that Morgan Stanley was recommending an investment to Whitestone and TBC that Morgan Stanley believed would fit the banks' portfolios.
 
 
 58
 I believe that the term "investment counselors" is ambiguous and that Morgan Stanley has offered a plausible interpretation within the range of possible meanings. Because the district court erroneously imposed the burden of proof on Morgan Stanley to prove its interpretation of this ambiguous term, see id. at 608, I would vacate and remand to the district court the TBC and Whitestone claims either to determine correctly the meaning of the term in light of the available extrinsic evidence or to apply contra proferentem.