The CANADA LIFE ASSURANCE COMPANY, Plaintiff,

v.

The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Defendant.

No. 02 Civ. 4210(VM).

United States District Court, S.D. New York.

Jan. 22, 2003.

Vincent J. Vitkowsky, Peter T. Maloney, Edwards & Angell, L.L.P., New York City, for Plaintiff.

Jerome C. Katz, David M. Raim, Chadbourne & Parke, L.L.P., New York City, for Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

The Canada Life Assurance Company ("Canada Life"), a Canadian Corporation, commenced this action, invoking the Court's diversity jurisdiction, against The Guardian Life Insurance Company of America ("Guardian"), a New York Corporation, for breach of contract. Guardian countered with the instant motion, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("CREFAA"), June 10, 1958, 84 Stat. 692, 21 U.S.T. 2517 (reprinted following 9 U.S.C.A. § 201), petitioning this Court for an expedited bench trial to determine the arbitrability of the underlying suit and a stay of all other issues, or in the alternative, to stay this action in favor of arbitration. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I. BACKGROUND[1]

This action arises from the reinsurance relationship between Canada Life and Guardian. Reinsurance is a business arrangement in which primary insurers transfer or cede risks of loss from the contracts they sell. An insurance company remits a percentage of premiums it receives to a reinsurer in exchange for an obligation by the reinsurer to be responsible for some percentage of the original insurance policy. Essentially, reinsurance is insurance for insurance companies. *See*

Continental Casualty Co. v. Stronghold Ins. Co., 77 F.3d 16, 20 (2d Cir.1996). Similarly, reinsurance companies may reduce their risk by selling portions of their reinsurance contracts to other reinsurers, thereby diversifying their underlying obligations among reinsurers. Reinsurance involving a reinsurer's purchase of another reinsurance company's obligations is known as "retrocessional" reinsurance, with the additional reinsurer referred to as a "retrocessionaire".

In this case, Canada Life is the original reinsurer and Guardian is a retrocessionaire. Guardian participated as a retrocessionaire through facilities managed by Insurance Services Associates ("ISA"). ISA facilities are part of a network of insurance companies through which the insurance industry distributes certain risks of loss. Guardian participated in retrocessional insurance through ISA first in 1999, when another reinsurer, the Manufacturer's Life Insurance Company ("Manulife"), acted as the issuing reinsurer, and then in 2000 and 2001 during which time Canada Life was the issuing reinsurer.

In 1999, Guardian agreed to participate in the ISA facility, divided into two subfacilities (ISA 1 and ISA 2), in connection with Manulife reinsurance contracts, after it was informed that ISA: (i) wrote up to $35 million in risk per occurrence per program between its two facilities: ISA 1 and ISA 2, (ii) wrote hundreds of risks, (iii) had a book of business with a "good spread of risk" based upon different high and medi-

---

1. The factual summary that follows derives primarily from Guardian's Memorandum of Law in Support of Defendant's Petition seeking an Expedited Bench Trial to Determine Arbitrability and a Stay of All Other Issues or, in the Alternative, to Stay this Action and Compel Arbitration, dated October 25, 2002 ("Guardian Mem.") and accompanying affidavits and exhibits attached thereto, as well as Canada Life's Memorandum in Opposition to Guardian's Petition Seeking an Expedited Bench Trial to Determine Arbitrability and a Stay of All Other Issues or, in the Alternative, to Stay this Action and Compel Arbitration, dated November 8, 2002 ("Canada Life Mem.") and accompanying exhibits and affidavits attached thereto. Except where specifically referenced, no further citation to these sources will be made.

um "attachment points" at which it underwrote risks, (iv) had outstanding loss reserves that were conservative, and (v) had purchased $15 million per occurrence in excess catastrophe coverage for the ISA facilities. For the year 1999, Guardian purchased 10 percent of the original reinsurance commitment made by ManuLife, which was $22,500,000 "per Occurrence per program" for ISA 1 and $12,500,000 "per Occurrence per program" for ISA 2. In other words, Guardian agrees that in 1999 its retrocessionaire commitment to Manulife extended to 10 percent of the full reinsurance commitment of Manulife, which potentially exposed Guardian to multiple obligations up to the agreed upon percentage, depending on the number of programs covered, per catastrophic occurrence. The understandings concerning Guardian's retrocessionaire participation in the ISA facilities for 1999 are reduced to writing in the 1999 Retrocession Placing Slips (hereinafter, the "1999 Agreement"). (*See* Affidavit of Thomas G. Kabele, dated October 22, 2002, ("Kabele Aff.") Exhs. B, C.)

In 2000 and 2001, Guardian agreed again to act as a retrocessionaire through the ISA facilities, in those years reinsuring Canada Life's reinsurance obligations. The same understandings concerning the functions of the ISA facility as set forth above continued to apply, except that the ISA facilities' "excess of" catastrophe protection were secured with a deductible of $10 million in 2000, (*id.* Ex. E), and $7 million 2001, (*id.* ¶ 55). Furthermore, Guardian increased its participation from 10 percent in 1999 to 15 percent in 2000 and about 18 percent in 2001. Finally, certain language in the Retrocessionaire Placing Slips in 2000 and 2001 was changed from the language in the 1999 slips with regard to the retrocessionaire's share accepted. The meaning of such modifications is contested, as explained below. The understandings concerning Guardian's retrocessionaire commitments in 2000 and 2001 are reduced to writing in solicitations from David Burry at the ISA to Thomas Kabele ("Kabele"), Senior Vice President of Guardian, (Kabele Aff. Exhs. D, G, J), email correspondence, (*id.* Exhs. E, F, K, L, M, N, and O) and Retrocession Placing Slips for each of ISA 1 and ISA 2 for 2000 and 2001, (*id.* Exhs. H and I) (hereinafter, the "2000 Agreement" and the "2001 Agreement" respectively).

On September 11, 2001, the terrorist hijackings and resulting aircraft crashes in New York, Virginia and Pennsylvania, claimed thousands of lives. The September 11 attacks impacted the ISA facilities significantly. According to Canada Life's calculations, because of the many tragedies that occurred that day, Guardian became liable for approximately $59 million of insurance coverage from its participation in the ISA facilities. Guardian asserts that this amount considerably exceeds the maximum obligation for which it believed it was exposed under the 2001 Agreement with Canada Life.

At that point two disputes arose. First, is the extent of Guardian's reinsurance participation in the 2000 and 2001 Agreements. Specifically, the parties disagree over whether Guardian accepted a more limited retrocessional commitment to cover only part of Canada Life's original reinsurance limits, or whether, similar to its 1999 commitment, Guardian's commitment was per occurrence per program, representing the full percentage share of Canada Life's original reinsurance policy. The dispute is reflected in a change in the wording indicating the "Retrocessionaire's Share Accepted." In the 1999 Agreement, the relevant share is expressed as a percentage of "Original Limits," the original limits being a certain amount of monetary exposure "per occurrence per program." (Kabele Aff. Exh. B at 3.) By contrast, in the 2000 and 2001 Retrocession Placing Slips, the

corresponding obligation is altered to the monetary limit, representing a percentage of the reinsurance commitment there reflected, "per Occurrence". (*Id.* Exhs. H at 3, I at 3, J.)

Guardian contends that this change represented an understanding between the parties that while Guardian accepted a percentage of Canada Life's original reinsurance obligation, it did so in a limited capacity. Specifically, Guardian asserts it was only obligated to pay its percentage share once per occurrence (in this case the occurrence being the September 11 attacks), and therefore it was not exposed to multiple payments of its percentage share per occurrence per program, which was Canada Life's original reinsurance commitment. In this case, such a limited participation would have confined Guardian's reinsurance exposure from the September 11, 2001 attacks to approximately $5.4 million.

Second, in reaction to the extensive liability it incurred in 2001 according to Canada Life's interpretation of the 2001 Agreement, Guardian also expresses concern over ISA's underwriting expertise and modeling techniques in managing catastrophe exposure and avoiding concentration of risks. Guardian therefore alleges that Canada Life has not managed catastrophe exposure in the manner contemplated under the 1999–2001 Agreements.

Based on Canada Life's representations as to the extent of Guardian's exposure under the 2001 Agreement, and Canada Life's alleged failure to appropriately undertake the management of catastrophic exposure, Guardian denies that the 2001 Agreement ever came into existence because there allegedly was never a meeting of the minds as to the essential terms of the parties' reinsurance relationship. Canada Life originally demanded arbitration of the dispute, but Guardian refused, purportedly because, under its construction of the FAA, the issue of the existence of the contract, including the applicability of the arbitration clause, should first be decided by a court and only then would arbitration be appropriate. Canada Life thereafter commenced this action. Guardian now petitions this Court, under § 4 of the FAA, for a determination of the arbitrability of the dispute, and if this Court finds that the 2001 Agreement was a binding agreement, a referral of the remainder of the dispute to arbitration.

## II. *DISCUSSION*

### A. *APPLICABILITY OF THE FAA*

■ While both parties agree that the 2001 Agreement, which is the basis for the claims brought in this action, requires arbitration of disputes concerning the contract, the parties argue that this matter belongs in this Court for various reasons. Guardian contends that pursuant to § 4 of the FAA, the question of whether the 2001 Agreement ever came into existence is a threshold issue that must be decided by the Court at an expedited bench trial, but then requests that, if the Court determines that a contract does indeed exist, the Court stay proceedings in favor of arbitration as to the contract dispute. Canada Life contends that this Court is the proper forum for resolution of the contract dispute since Guardian is not entitled to invoke the FAA because: (i) Guardian is not aggrieved by Canada Life's failure to arbitrate under § 4 of the FAA; and (ii) Guardian is in default in proceeding with such arbitration under § 3 of the FAA and has therefore waived its right to arbitration. Alternately, Guardian argues that the Air Transportation Safety and System Stabilization Act ("ATSA"), Pub.L. No. 107–42, 115 Stat. 230 (Sept. 22, 2001), *as amended by,* Pub.L. No. 107–71, 115 Stat. 597 (Nov. 19, 2001), vests the Court with original and exclusive jurisdiction over this

dispute. Because this argument has been denied by another district judge in this district with respect to a separate retrocessionaire, *Canada Life Assurance Co. v. Converium Ruckerversicherung AG,* 210 F.Supp.2d 322 (S.D.N.Y.2002), Guardian asks that briefing on this issue be stayed pending a decision on appeal. The Court addresses each of these contentions in turn.

■ At the outset, the Court notes that the FAA establishes a strong federal policy in favor of referring parties to arbitration over litigation, if the parties agreed to arbitrate their disputes. *See, e.g., Sandvik v. Advent International Corp.,* 220 F.3d 99, 104 (3d Cir.2000); *Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 981 (2d Cir. 1996); *Carcich v. Rederi A/B Nordie,* 389 F.2d 692, 696 (2d Cir.1968). The presumption in favor of arbitration has particular weight in the context of international commerce because, as a signatory to the CREFAA, the United States is committed to refer parties to arbitration when the parties have agreed to arbitrate disputes. *See* CREFAA, Art. II (committing signatory states to refer parties to arbitration when the parties have agreed to arbitrate.); *Sandvik,* 220 F.3d at 104 (citing *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.,* 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

■ However, it is well settled that when the existence of the contract from which the obligation to arbitrate arises is itself called into question, it is the obligation of the court, before a dispute is referred for arbitration, to determine, in the first instance, whether the contract itself is valid. *See, e.g., Sandvik,* 220 F.3d at 107–108 ("under both the CREFFA and

the FAA a court must decide whether an agreement to arbitrate exists before it may order arbitration"); *Kulukundis Shipping Co. v. Amtorg Trading Corp.,* 126 F.2d 978, 986 (2d Cir.1942) ("We conclude that it would be improper to submit to the arbitrators the issue of the making of the [contract]."); *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("the existence of an agreement to arbitrate is a threshold question for a court to resolve, absent a clear and unmistakable delegation of that authority to an arbitrator.") In fact, the Supreme Court has declared that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

Therefore, it would appear that Guardian's challenge to the existence of the 2001 Agreement should not be decided by arbitrators, but rather by the Court. Furthermore, since this issue is now properly before the Court and not the arbitration panel, it does not make sense for Guardian to be required to engage in arbitration proceedings, or be faulted for not so engaging, until this threshold issue has been decided.

However, Canada Life contends that the issue is more complicated. While there is language in § 4 of the FAA[2] necessitating a finding by a court that a contract exists before arbitration can be compelled, as well as before a stay of proceedings can be ordered pursuant § 3 of the FAA,[3] in this

---

**2.** "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." FAA § 4.

**3.** "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court

case Canada Life contends that because neither §§ 3 or 4 of the FAA are available to Guardian, Guardian can not ask the Court to refer this action for arbitration or to make a preliminary finding as to arbitrability. In other words, Canada Life argues that because Guardian has previously refused to arbitrate, it is only Canada Life that is entitled to invoke the FAA and, at Canada Life's option, this case is properly brought in this Court.

Canada Life's contention arises out of the strange procedural posture of this action. Unlike what occurs in the most predictable application of §§ 3 or 4 of the FAA, where the litigant invoking the FAA is the party that previously attempted to commence arbitration proceedings, or that at the time of the motion wishes to commence arbitration proceedings, in this case the party invoking the FAA is simultaneously denying the existence of the contract in its entirety. Accordingly, Guardian is in the awkward position of having previously resisted arbitration, and in essence resisting arbitration currently, while simultaneously petitioning the Court to compel arbitration if it finds that a contract does in fact exist.

Canada Life contends that this "awkward effort both to deny and enforce the agreements" is not legally supportable. (Canada Life Mem. at 12.) Specifically, Canada Life argues that Guardian has not been aggrieved by Canada Life's failure to arbitrate, which is necessary to invoke § 4 of the FAA, because it is Guardian that has resisted Canada Life's efforts to arbitrate. Similarly, Canada Life asserts that § 3 of the FAA is not available to Guardian because Guardian is in default under that section due to its refusal to arbitrate when Canada Life requested. Therefore, Canada Life contends that arbitration is no longer available to Guardian because it has waived any such prerogative.

By putting substance over form, these procedural irregularities can be reconstructed and simplified. Essentially, Guardian asks only for that to which it is legally entitled: to have the threshold issue of whether the contract between it and Canada Life exists decided by the Court, and if the Court determines that the contract does exist, to have the contractual dispute resolved by arbitration as provided for in the parties' underlying Agreements. The strangeness of this case arises only because there are various methods for arriving at this result. In other words, the dispute is not as anomalous as Canada Life seems to argue; other cases decidedly serve as precedent for this Court to determine that Guardian Life is entitled to what it seeks. *See, e.g., Kulukundis*, 126 F.2d at 978–979.

For instance, in *Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, a former employee filed suit seeking a declaratory judgment as to whether he was subject to an arbitration agreement, as well as an order compelling arbitration pursuant to that agreement, believing that his former employer would resist arbitration and file a separate suit against him. 725 F.2d, 192, 194–195 (2d Cir.1984). The Second Circuit determined that although a motion to compel was premature, since the defendant had at no point actually resisted arbitration, Downing was entitled to a declaratory judgment on the existence of the agreement because that issue was a matter for a court and not an arbitration panel to decide. *Id.* at 195. Therefore, although Downing had not been "aggrieved" by defendant's failure to arbitrate, he was still entitled to a declaratory judgment from

in which such suit is pending, *upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under* *such an agreement,* shall on application of one of the parties stay the trial of the action ...'' FAA § 3 (emphasis added).

the court on the issue of the existence of the contract. *Id.*

Similarly, in *Kulukundis*, the defendant, similar to Guardian, alleged that no contract existed, but, in the alternative, that if it did, the case was subject to an arbitration clause. 126 F.2d at 980. However, in *Kulukundis*, the plaintiffs had never attempted to commence arbitration proceedings with the defendant. *Id.* The Second Circuit affirmed the district court's determination as to the existence of the contract, pointing out that it would be improper to submit that decision to the arbitrators, and ordered that a stay of the proceedings as to damages should have been ordered, pursuant to § 3 of the FAA, to allow the arbitrators to properly to determine that issue under the contract. *Id.* at 987–988.

Essentially, despite the posture of the parties, in both *Downing* and *Kulukundis* there are two issues, which are dealt with separately: the threshold issue as to the existence of the contract, decided by the court and any remaining issues that need be decided if the contract does exist, resolved by the arbitration panel, pursuant to the contract itself. *See also Sandvik*, 220 F.3d at 107–108; *Becker v. DPC Acquisition Corp.*, No. 00 Civ. 1035, 2002 WL 1144066 (S.D.N.Y. May 30, 2002). Either party, regardless of who alleges which part of this two-part conundrum, has a right to have the matter handled accordingly.

It is not surprising that Guardian did not agree to arbitration, or that it did not initially seek recourse in the Court. As the defendant in this case, as well as the party who denies the existence of the agreement, it has no interest in initiating the action either in court or before an arbitration tribunal. But these circumstances should not necessitate that Guardian bring an action for a declaratory judgment in order to have the matter decided appropriately, as the plaintiff did in *Down-*

*ing*, when it reasonably would prefer to refrain from court action entirely. Furthermore, the fact that in this case, unlike plaintiffs in *Kulukundis*, Canada Life made some move toward arbitration, which was rejected by Guardian because of its denial of the existence of the contract, should not deny Guardian the right to have the existence of the contract determined by a court or the right to have the dispute handled by the arbitrators as agreed to in the 2001 Agreement, if the Court finds that the contract exists.

The reasons advanced by Canada Life as to why the FAA is not available to Guardian are unconvincing. Based on the language of the FAA, a party must be "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate" before invoking § 4. Canada Life contends that because Guardian contests the existence of the arbitration agreement, and because it previously refused to go to arbitration, it is at "at best the party 'in default' " and therefore can not claim to be "aggrieved". (Canada Life Mem. at 11.) This reasoning conflates the two separate issues that are before the Court. While it was appropriate, and understandably the only course available, for Canada Life to bring this cause of action into federal court for the purposes of attempting to force Guardian to acknowledge the existence of the contract, if the contract is so acknowledged, under its explicit terms, the parties are obligated to arbitrate. Therefore, by pressing this Court to hear not only the threshold issue of whether the contract exists, but also to determine liability under the contract, and thereby resisting Guardian's desire to arbitrate the matter if the Court determined that the 2001 Agreement exists, Canada Life effectively has aggrieved Guardian through its avoidance of the arbitration clause.

The cases cited by Canada Life to support its contention can be distinguished, and in fact, support Guardian's position. (Canada Life Mem. at 9–10.) In *Sandvik*, the Third Circuit refused defendant's motion to compel arbitration only because it first insisted that defendant's denial of the existence of the contract must be determined in court. 220 F.3d at 110–111. But, upon such a determination, the Circuit Court suggests arbitration would be appropriate. *Id.* In *Dean Witter Reynolds Inc. v. Prouse*, the district court found that it was improper to compel arbitration before the NASD because "Dean Witter concedes that arbitration before the NASD in New York City is proper under the [parties'] agreement, and it has expressed a willingness to litigate [the] dispute in that forum." 831 F.Supp. 328, 332 (S.D.N.Y. 1993) Therefore, the *Dean Witter* court ordered a stay under § 3 of the FAA and allowed the parties to resolve the dispute according to their agreed upon forum, determining that any compulsion in that case would have been redundant. *Id.*

In *Downing*, the Second Circuit specifically held that "[u]nless Merril Lynch commences litigation or is ordered to arbitrate the dispute by the Exchange and fails to do so, it is not in default of any arbitration ... ." for purposes of entitling Downing to invoke § 4 of the FAA. 725 F.2d at 195; *see also Hartford Acc. & Indem. Co. v. Equitas Reinsurance Ltd.,* 200 F.Supp.2d 102, 110 n. 9 (D.Conn.2002) (holding that plaintiffs were not aggrieved under § 4 of the FAA because "[i]t is not known at this time whether one or more of the arbitration defendants will actually refuse to arbitrate.") The defendant in *Downing* had not brought the case to court. *Downing,* 725 F.2d at 195. But, the court still made the determination as to the existence of the contract and stayed proceedings pending arbitration of the contract dispute. *Id.*

Both *Downing* and *Dean Witter* stand only for the proposition that unless there has been refusal by the opposing party to arbitrate, a motion to compel is not appropriate. Therefore, at the least, these precedents support Guardian's alternative proposition that this action be stayed pending arbitration of the contract dispute under the Agreement. In addition, in both *Downing* and *Dean Witter* there was no evidence before the court that defendants were avoiding arbitration. Here, Canada Life does contend that arbitration is no longer an appropriate forum to adjudicate the merits of the parties' dispute.

Other cases further support a finding that Guardian is entitled to relief under § 4, as well as § 3 of the FAA. In *Kulukundis*, although the Second Circuit ultimately granted a stay under § 3, the Circuit Court suggests that the defendant, who both protested the existence of the agreement and requested arbitration if the court found the agreement existed, had § 4 available to it as well if defendant so requested.[4] 126 F.2d 978, 981 n. 4. In *Becker*, the defendant similarly both denied the existence of the contract but sought arbitration if the contract was deemed to exist. 2002 WL 1144066, at *2. Although, as Canada Life points out, whether or not the defendant was "aggrieved" was not addressed, the court came to the conclusion that § 4 was available to the defendant. *Id.* at *3, 4. A reasonable implication of such a finding is that the *Becker* court found that the defendant, similar to Guardian here, was in fact aggrieved.

---

**4.** The *Kulukundis* court later notes that § 3 is the easier section to apply since equitable concerns do not pertain, and the district court was never asked to compel arbitration by the defendant, but does not directly address whether § 4 would also be available to the defendant. 126 F.2d at 987–988.

Canada Life also argues that Guardian is in default and has waived its right to arbitrate under § 3, comparing the case to *Lane Ltd. v. Larus & Brother Co.*, 243 F.2d 364 (2d Cir.1957). In *Lane*, the Second Circuit found that the defendant had "forfeited its right to arbitrate" by refusing to arbitrate prior to plaintiff's commencing an action in court. 243 F.2d at 367. The defendant in *Lane* refused to arbitrate the issue of damages suffered by the plaintiff because he contended that such damages were not the proper subject of the arbitration clause. 243 F.2d at 365–366. Once the plaintiff commenced proceedings in court, the defendant moved under § 3 of the FAA for a stay of the suit pending arbitration. The issues defendant requested to be referred to arbitration were precisely the same issues that he previously refused to arbitrate. Furthermore, the court was satisfied that all the damages issues that defendant refused to arbitrate were clearly covered by the arbitration clause. Therefore, the *Lane* court determined that the defendant was clearly at fault for not agreeing to arbitrate those issues earlier. *Id.* at 367 ("[defendant] was clearly wrong since the arbitration clause, by its terms, covered all disputes between the parties.")

In this case, Guardian did not refuse to arbitrate in general; it only refused to arbitrate the issue of the existence of the contract, a matter which should not be addressed to an arbitration panel. Furthermore, the issues that Guardian seeks to have arbitrated in this petition are separate from the issue Guardian refused to put before the arbitrators previously. The holding of the Second Circuit in *Lane*, that "[a] party cannot raise unjustifiable objections to a valid demand for arbitration, all the while protesting its willingness in principle to arbitrate ...", *id*, underscores the reason *Lane's* holding does not apply here: Guardian's objection is justifiable. The Second Circuit explicitly made this same finding in *Kulukundis*, rejecting the argument that a defendant who contests the existence of a contract, but pleads in the alternative that the dispute is subject to an arbitration clause, waives his right to a stay of the proceedings pending arbitration. 126 F.2d at 987–988. Guardian is not in default and therefore maintains its right to avail itself of § 3 of the FAA.

In this case, either § 3 or § 4 is potentially applicable and will likely lead to the same result.[5] Canada Life seeks relief under § 4 for an expedited bench trial, (Guardian Mem. at 20), or, alternately, a stay of proceedings under § 3 (Guardian Mem. at 24), if the court determines the contract exists. By the same token, Guardian asks the Court to award it partial relief under § 4 of the FAA, for an expedited bench trial to determine arbitrability, and partial relief under § 3, to stay proceedings and refer the case to arbitration, if the Court determines that contract exists.[6] Since Guardian is the party currently petitioning the Court through the instant motion, but Canada Life would be the claimant in an arbitration proceeding,

---

5. Whether this court compels arbitration or issues a stay, Canada Life will ultimately be forced to seek damages through arbitration for the breach of contract it alleges.

6. The Court notes that although in Guardian's introduction to its petition, as well as in its title, Guardian seems to request that the Court compel arbitration, (*see* Guardian Mem. at 1), later in its memorandum of law, in the argument and in the conclusion, Guardian specifically requests that the Court "stay this action in favor arbitration" pursuant to § 3 of the FAA, (*see* Guardian Mem. at 2, 24–25). Since this Court believes that a stay under § 3 is most appropriate, it will interpret Guardian's mixed request to be a request for an expedited trial on the issue of arbitrability, and upon determination that the contract exists, a stay of proceedings in favor of arbitration pursuant to § 3 of the FAA.

it is most appropriate to stay the proceedings in this Court and allow Canada Life the opportunity to bring an action before arbitrators, pursuant to § 3 of the FAA, rather than compel Guardian as plaintiff to bring an action for breach of contract under § 4. Furthermore, the Court sees no reasons why the provisions of § 4 concerning the necessity for a determination as to the existence of the contract, and the procedural requirements necessitated to make such a determination, should not apply equally in the case of a stay under § 3. The Second Circuit has clearly indicated that under § 3 a determination as to the arbitrability of the contract is necessary before a stay of proceedings is appropriate. *See, e.g., Kulukundis* 126 F.2d at 986.

Accordingly, the Court grants Guardian's request for a determination as to the existence of the contract and will order a stay of the proceedings pending arbitration, if the 2001 Agreement is determined to exist. However, before this case can be referred for arbitration, the Court must be satisfied that a contract, including the arbitration clause, exists.

### B. *THE EXISTENCE OF THE 2001 AGREEMENT*

■ Guardian requests an expedited bench trial to determine the issue of arbitrability pursuant to § 4 of the FAA, and which this Court finds equally applicable before a stay of proceedings under § 3 of the FAA. Guardian argues that because there was no meeting of the minds as to all essential terms of the contract, the 2001 Agreement never came into existence, therefore precluding recourse to arbitration under the agreement. Specifically, Guardian asserts that no contract came into being because of different understandings by the parties as to the terms of the contract with regard to: (i) Canada Life's undertaking to manage catastrophe exposure by appropriate underwriting to maintain a good spread of risk and to employ expertise and a disciplined underwriting style; and (ii) whether or not there was a one-time per occurrence monetary cap to Guardian's risk exposure under the 2001 Agreement or a per occurrence per program limit committing Guardian to a percentage share of the entirety of Canada Life's original reinsurance limits. Canada Life counters that such disputes represent at most differences of interpretation as to terms of the contract, but are not differences that prevent the manifestation of mutual assent necessary to create a contract.

■ While the Court must be satisfied that a contract obligating the parties to arbitrate their disputes exists before staying proceedings and referring the parties to arbitration, an expedited bench trial to determine arbitrability under § 4 of the FAA is not granted automatically. The legal standard for determining whether Guardian is entitled to a trial on the issue of the existence of an agreement to arbitrate is laid out in *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*: there must be an unequivocal denial that an agreement has been made, accompanied by supporting affidavits providing some evidence substantiating the claim.[7] 263 F.3d 26, 30 (2d Cir.2001) (citing *Interocean Shipping v. Nat'l Shipping & Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972); and *Almacenes Fernandez, S.A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir.1945)); *see also Interbras Cay-*

---

7. The Third Circuit has characterized this standard as equivalent to the summary judgment standard: "If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Par–Knit Mills, Inc. v. Stockbridge Fabrics Company*, 636 F.2d 51, 54 (3d Cir.1980).

*man Co. v. Orient Victory Shipping Co.,* 663 F.2d 4, 7 (2d Cir.1981).

This Court is not persuaded that Guardian has adduced facts sufficient to require an expedited bench trial on the two alleged misunderstandings in dispute. Guardian's denial of the 2001 Agreement is not unequivocal, and the affidavits submitted by Guardian do not substantiate a claim that a disagreement concerning the formation of the contract exists, as opposed to disputes regarding the interpretation of terms in the underlying contract.

■ First, under the standard established in *Golodetz,* "To make a genuine issue entitling the plaintiff to a trial by jury, an unequivocal denial that the agreement had been made was needed ..." 148 F.2d at 628. Here, Guardian's denial has not been unequivocal.[8] On January 25, 2002, in a letter to Canada Life, Jeremy Starr, Vice President of Reinsurance at Guardian, indicated that Guardian "does not dispute that it agreed to participate" in the 2001 Agreement. (Affidavit of Jeremy Starr ("Starr"), dated October 22, 2002, ("Starr Aff.") Exh. E at 1) Rather, he says the focus of his prior letter was "upon the terms and conditions of that participation ..." (*Id.*)

More compelling than this one letter, is the entire two and a half year course of dealing between the parties. The 2000 Agreement contained the same terms and conditions as the 2001 Agreement, yet Guardian never returned any premiums and the 2001 Agreement was never challenged. It is implausible that the 2001 Agreement was considered valid, while the same contract executed for 2001 is invalid. Rather, the Court concludes that both the 2000 and 2001 Agreements are fully valid, and finds that it is only the application of the 2001 Agreement to the events of September 11 that are at issue here.

Second, Guardian has not set forth sufficient evidence to substantiate its claim that there was no meeting of minds between the parties to the 2001 Agreement. *See Sphere Drake,* 263 F.3d 26, 30–32. Although Guardian has put forth affidavits stating that a meeting of the minds did not occur, the evidence presented does not substantiate a lack of mutual assent. Statements by Kabele and Starr to that effect are conclusory. While Guardian interprets the law to dictate that the entitlement to a trial on the issue of the existence of the contract "is easily triggered," (Guardian Mem. at 15), some evidence to substantiate the claim that the 2001 Agreement is void must be put forward, and, as indicated by the Second Circuit, "[void] contracts are rare." *Sphere Drake,* 263 F.3d at 31; 1 Corbin on Contracts § 1.7 (Rev. ed.1993) (a contract is void only if it creates "no legal relation of any kind" between the parties).

Some disputes that question the existence of mutual assent deal only with the issue of whether final agreement was ever actually intended. The more difficult question of mutual assent, and the one at issue here, occurs in cases where the parties have entered into an agreement, but each party later alleges such different understandings of the terms agreed upon that a legitimate question arises as to whether the contract was created at all.

---

**8.** The Court notes that despite its holding that Guardian's denial of the existence of the contract was not unequivocal, it does so on decidedly different grounds from those argued by Canada Life. The Court finds Canada Life's argument that Guardian's pleading in the alternative makes Guardian's denial equivocal because "it carries the promise of later change or revision" if Guardian loses the expedited bench trial, unconvincing. (Canada Life Mem. at 17–18.) Such a pleading in the alternative, consistent with the spirit of Fed. R.Civ.P. 8(e), only preserves Guardian's right to arbitration if this Court determines that the 2001 Agreement exists.

In such cases, "[i]t is important to distinguish between the common problem of interpretation of key terms of contract and the much less common question whether a material difference of understanding has prevented the manifestation of mutual assent necessary to create a contract at all." Restatement (Second) of Contracts § 20, Reporter's Note to cmts. b and c (1981). The line between these two inquiries is not easily drawn, but must be determined with reference to the nature of the contract and the extent of the ambiguities asserted. *See id.* § 20 cmt. b.[9]

In *Colfax Envelope Corporation v. Local No. 458–3M, Chicago Graphic Comm. Int'l Union, AFL–CIO,* Judge Posner discusses at length the difficulty in determining the voidness of a contract due to a failure to agree on essential terms:

> The premise—that a "meeting of the minds" is required for a binding contract—obviously is strained. Most contract disputes arise because the parties did not foresee and provide for some contingency that has now materialized—so there was no meeting of minds on the matter at issue—yet such disputes are treated as disputes over contractual meaning, not as grounds for rescinding the contract and thus putting the parties back where they were before they signed it.

20 F.3d 750, 752 (7th Cir.1994). Not every misunderstanding between the parties following execution of an agreement could possibly void a contract, since almost any contractual dispute is based on some disappointment of expectations.

 Rather, it is only where no sensible ground exists for choosing between conflicting understandings of the contractual language, and where the parties agree to terms that reasonably appear on their face to each of them to be unequivocal but in fact are not—as in cases like that of the ship "Peerless" in which the ambiguity is buried[10]—that a voiding of the contract is necessary. *See Colfax,* 20 F.3d at 753; *Oswald v. Allen,* 417 F.2d 43 (2d Cir.1969) (where prospective buyer believed that he had offered to buy all Swiss coins owned by collection owner while owner reasonably understood the offer to relate to a particular collection of coins, a contract for sale never came into existence). As alternately stated, only if the parties attributed materially different meanings to terms, neither one knew or had reason to know the meaning contemplated by the other, and the term is essential for purposes of contract formation, then the contract is void. *See* 1 Corbin on Contracts § 4.10 (Rev. Ed.1993); *Interocean Shipping,* 462 F.2d at 676; *Flower City Painting Contractors, Inc. v. Gumina Constr. Co.,* 591

**9.** The comment observes: "The meaning given to words or other conduct depends to varying extent on the context and on the prior experience of the parties. Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy. But material differences of meaning are a standard cause of contract disputes, and the decision of such disputes necessarily requires interpretation of the language and other conduct of the parties in the light of the circumstances." *Id.*

**10.** The Peerless case refers to *Raffles v. Wickelhaus,* 2 H. & C. 906, 159 Eng. Rep. 375 (Exh. 1864), in which the parties contracted for the delivery of a shipment of cotton from Bombay to England on the ship "Peerless" but, unbenkownst to each, there were two ships named "Peerless" sailing from Bombay on different dates, and one party thought the contract referred to one of those ships, and the other party had in mind the other vessel. This is the classic example of the lack of meeting of the minds causing a contract to be void, because the terms seemed entirely unequivocal to both parties, and neither party had any reason to know of the other's understanding.

F.2d 162, 165 (2d Cir.1979) (while customary industry usage can normally be used to resolve ambiguous terms, in this case inexperienced subcontractor could not be held to have known industry practice).

Therefore, the question for this Court is whether the 2001 Agreement presents a fundamental misunderstanding on a term that is so ambiguous that a court should not remit the parties to arbitration and declare the contract void, or, on the other hand, whether the issue presented as to contract formation is sufficiently unambiguous that an arbitrator may resolve any differences that exist concerning the terms through contract interpretation.

### 1. *Extent of Guardian's Reinsurance Commitment*

 Guardian alleges that a meeting of the minds failed to occur because of a misunderstanding concerning the extent of Guardian's reinsurance obligation. Guardian maintains that the parties disagree as to the meaning of "per Occurrence" in the 2000 and 2001 Retrocession Placing Slips. (*See* Kabele Aff. Exhs. H. at 3, J.) Guardian argues that the designation of a specified amount of money "per Occurrence" as the "Retrocessionaire's Share Accepted," which was the language used in the 2000 and 2001 slips, (*Id.*), denotes a limited commitment to pay only its percentage share of the overall risk once in the event of a single catastrophic occurrence, as opposed to a percentage of "Original Limits,"

which was the designated language for the Retrocessionaire's Share Accepted in 1999. (*See Id.*, ¶ 49.) On the other hand, Canada Life asserts that in the 2000 and 2001 Agreements, similar to the 1999 Agreement, Guardian committed to a per quota share of the entirety of Canada Life's original insurance limits, which exposed Canada Life to a certain amount of insurance per occurrence per program (multiple potential payments per occurrence). Guardian argues that, in satisfaction of the *Colfax* test to determine whether such an ambiguity might void a contract, each party potentially could have thought the term unequivocal at the time of the agreement, but now finds that two different and plausible understandings were contemplated.

While Guardian contends that there are two reasonable understandings of the extent of Guardian's reinsurance participation under the 2001 Agreement, there is a "sensible basis for choosing between conflicting understandings," a circumstance not present in *Oswald* or *Raffles.*[11] *Id.* at 753 (quoting *Oswald,* 417 F.2d at 45.) The appropriate basis for deciphering the parties' intent and reconciling the conflict is through examination of reinsurance industry practice, custom and usage and the law relating to the interpretation of insurance contracts.

 Here, both parties are professional reinsurers. No doubt each has handled numerous such retrocessionaire agreements.[12] Guardian admits it has been in

---

**11.** In *Oswald,* 417 F.2d at 45, the parties literally did not speak the same language and in *Raffles,* 2 H. & C. at 906, there was confusion as to which boat the term "Peerless" referred to.

**12.** The Court notes that despite the fact that both Canada Life and Guardian are experienced insurers, Guardian suggests that it is not an experienced underwriter of accident and health reinsurance but that its participation in the ISA facilities at issue here was

an attempt by Guardian to further develop participation in the reinsurance marketplace. (*See* Kabele Aff. ¶¶ 2–4.) Such inexperience has been used to obviate the appropriateness of relying on industry practice to resolve ambiguity. *See Flower City,* 591 F.2d at 165 (a misunderstanding as to a term in a contract was, at least in part, caused by one party's inexperience as a contractor, who therefore did not know or have reason to know of the existence or nature of the term's common usage). However, Kabele acknowledges that

the reinsurance industry for over fifteen years. While some misunderstanding may be conceivable, and the arbitrators will no doubt have to make such a determination, these parties did enter into a contract by agreeing to the 2000 and 2001 placing slips. To hold otherwise would undermine ordinary practice in the reinsurance industry.

■ Reinsurance slips are widely recognized within the reinsurance industry as evidencing contractual commitments. In discussing the use of short hand slips or binders in the insurance industry, the New York Court of Appeals explained: "It is a common and necessary practice in the world of insurance, where speed often is of the essence, for the agent to use this quick and informal device to record the giving of protection pending the execution and delivery of a more conventionally detailed policy …" *Employers Commercial Union Ins. Co. v. Firemen's Fund Ins. Co.,* 45 N.Y.2d 608, 412 N.Y.S.2d 121, 384 N.E.2d 668, 670–671 (1978). However, the ambiguity inherent in such shorthand contracts does not render them void. *See id.; Matter of Seiderman v. Herman Perla, Inc.,* 268 N.Y. 188, 197 N.E. 190, 191 (1935).

■ The existence of ambiguous terms alone does not void contracts. If a term is ambiguous, it is generally the function of the court to interpret those terms. It is well settled that if two parties give different meanings to words of a purported agreement, the party who sues for enforcement in accordance with his own meaning has the burden to demonstrate that the other party knew what the claimant's meaning was. *See Mefer S.A.R.L. Of Paris, France v. Naviagro Maritime Corp.,* 533 F.Supp. 337, 345 (S.D.N.Y.1982); *Murphy v. Gutfreund,* 583 F.Supp. 957,

961 (S.D.N.Y.1984). In insurance contracts, "once a court determines that, as a matter of law, a term of an insurance policy is ambiguous, 'it may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" *See Morgan Stanley Group v. New England Ins. Co.,* 36 F.Supp.2d 605, 609 (S.D.N.Y. 1999), *aff'd in relevant part and vacated on alternate grounds by,* 225 F.3d 270 (2nd Cir.2000), *on remand to,* 222 F.Supp.2d 381 (S.D.N.Y.2002) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998)); *see also Hartford Accident & Indem. Co. v. Wesolowski,* 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907, 909 (1973). "Where extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the *contra proferentem* rule of contract construction and construe any ambiguities in the contract against the insurer as a matter of law." *Morgan Stanley Group,* 36 F.Supp.2d at 609 (S.D.N.Y. 1999) (citing *McCostis v. Home Ins. Co. of Ind.,* 31 F.3d 110, 113 (2d Cir.1994)); *State v. Home Indem. Co.,* 66 N.Y.2d 669, 495 N.Y.S.2d 969, 486 N.E.2d 827, 828–829 (1985); *see also, Alfin, Inc. v. Pacific Ins. Co.,* 735 F.Supp. 115, 119 (S.D.N.Y.1990).

These doctrines relating to the interpretation of insurance contracts were developed to facilitate resolution of disputes among parties concerning the meaning of ambiguous terms of contracts. If every time an ambiguity arose concerning a term of an insurance contract, one party were allowed to nullify the contract on the ground that no agreement was ever reached because of the parties' failure to

---

Guardian has been in the reinsurance industry for around 15 years: "Beginning in the 1980s, Guardian Life wished to further develop its participation in the reinsurance market-

place." (Kabele Aff. at 2.) Given this significant experience in the industry, Guardian can be presumed to be familiar with industry practice.

assent to all terms, these well-settled doctrines would have been developed in vain. *See Iowa–Des Moines National Bank v. Insurance Company of North America,* 459 F.2d 650, 655 (8th Cir.1972) (entitling an insurer to claim to meeting of the minds because it can produce evidence showing a disagreement as to the interpretation of the contract, would defeat the law's well-founded position that where two reasonable interpretations exist, the one that will sustain the claim and cover the loss will be adopted). Rather, settling disputes concerning ambiguous terms in insurance contracts is a matter of fact to be settled by extrinsic evidence, or by the *contra proferentem* rule of contract construction, and not by voiding the contract itself.

Further, as was the case in *Colfax,* the parties here could have realized that the term in dispute was unclear: "It is common for contracting parties to agree—that is, to signify agreement—to a term to which each party attaches a different meaning. It is just a gamble on a favorable interpretation by the authorized tribunal should a dispute arise." 20 F.3d at 753–754. The mere phrase "per Occurrence" certainly leaves room for interpretation. Therefore, by agreeing to a potentially ambiguous term, the parties also assented to have any disputes resolved as provided for in the contract, not by seeking to void the contract altogether.

This case is analogous to *Iowa–Des Moines National Bank,* where the parties engaged in an insurance contract, but had different understandings at the time of entering into the agreement about the extent of the applicable coverage. 459 F.2d at 653–654. The Eighth Circuit there held that the insurer, which was denying the existence of the contract, was not entitled to judgment, despite a jury finding that there was no meeting of the minds as to the extent of the coverage, because "[in] the instant case a premium was paid, a

contract entered into, a certain hazard insured against." Because the court found that the contract essentially did exist despite the misunderstanding, it refused to void the agreement as a matter of law, but allowed one of the two interpretations to prevail. Generally, the *de facto* existence of a contract may influence a determination as to a term concerning which there has been a misunderstanding: "[i]f however, it is clear that the parties tried to make a valid contract, and the remaining doubt as to the proper interpretation is merely as to which of two possible and reasonable meanings should be adopted, the court will adopt that one which is less favorable in its legal effect to the party who chose the words." 3 Corbin on Contracts § 559 (1960).

Given the facts of this case, the confusion concerning the "per Occurrence" term similarly did not void the formation of the contract. Here, the parties' contemplation in the choice of this term did not arise, as in a "Peerless" situation, from a single transaction between strangers, but must be ascertained in the context of prior dealings, associated regular course of conduct spanning several years, and relevant industry practices and usages presumably known to both. A contract was undeniably formed for 2001 at least on the basis of Guardian's interpretation of "per Occurrence," which would constitute insurance coverage up to $5.4 million ($4.05 million for ISA1 plus $1.35 million for ISA2). Any confusion as to the "per Occurrence" term in the contract could not cancel this much of Guardian's reinsurance participation. Since it is conceded that this much insurance, at the least, has been agreed to by the parties, a contract has been formed and the arbitration clause is applicable. In addition, although the dispute over the "per Occurrence" term is of great monetary significance, clear evidence that this dispute does not go to the formation of the

contract itself is that for the 2000 Agreement, for which Guardian expresses the same misunderstandings, Guardian accepted the premiums and the contract ensued as contemplated, even though the same terms applied. The difference in 2001 is that the traumatic events of September 11 created such unforeseen exposure that the limits of the insurance contracts, where catastrophic cover was insufficient, were put to the forefront.

### 2. *Canada Life's Management of Risk Exposure*

 Guardian's assertions concerning Canada Life's failure to manage catastrophe exposure due to Guardian's disappointment in Canada Life's "competence" and "discipline" with regard to underwriting the risks Guardian undertook, based on the representations Canada Life had made,[13] also do not constitute misunderstandings so fundamental as to void the contract. Although Guardian tries to frame the disagreement as one constituting a lack of mutual assent by asserting that Canada Life has revoked the entirety of its commitment to competently underwrite the risks of the ISA facility and keep a good spread of risks, (*See* Guardian Mem. at 18, 19; Starr Aff. ¶¶ 14, 15 & Exh. G), a review of the record demonstrates no evidence of such complete denial of the basic understandings underlying the 1999–2001 Agreements by Canada Life, (*See* Canada Life Mem. at 19–20; Starr Aff. Exh. F), other than conclusory statements by Starr. Rather, Canada Life argues that although it made reasonable efforts to competently underwrite risks in the ISA facility, the unforeseeable onslaught of liability caused by the September 11 attacks on the World Trade Center

exceeded its every expectation concerning risk assessment: "This is a complaint with 20/20 hindsight. There isn't an insurer, especially in the world after the terrible events of September 11, 2001, that wouldn't wish for more coverage in the face of a claim that breaches the limit of its protection, catastrophe or otherwise. This certainly isn't a reason to refuse payment of valid claims." (Starr Aff. Exh. F at 2.)

For instance, Guardian attempts to demonstrate the lack of mutual assent by claiming that while it understood that Canada Life was undertaking to manage exposure "by appropriate underwriting to maintain a 'good spread of risks,' Canada Life asserts that it is possible to have met the standards set forth in the Agreements such that tenants at a single location—the World Trade Center—'comprise a substantial portion of the original insurance losses reinsured by Canada Life.'" (Guardian Mem. at 19.) However, Canada Life's assertions do not constitute a rejection of the terms of the contract, only a dispute as to what it was required to have done in order to meet those standards. (*See also* Starr Aff. Exh. B, F.) Furthermore, Canada Life's failure to provide sufficient evidence that disciplined techniques were used, does not provide evidence of Canada Life's rejecting its obligations, as Guardian contends. (Guardian Mem. at 19.)

In addition, Guardian cites the Starr Aff. ¶ 15, which refers to the Starr Aff. Exh. F at 4, for the proposition that Canada Life does not believe it had any obligation to manage catastrophe cover. However, review of this exhibit only reveals that Canada Life purchased a "finite amount of catastrophe cover for the bene-

---

13. It is not clear form the submissions to what extent such representations on the part of Canada Life constituted part of the agreements as opposed to mere advertising and solicitation, which might go to the issue of misrepresentations but not breach of contract. However, for the purposes of the current motion, the Court will assume that such representations were meant as obligations by Canada Life.

fit of the participants" and that further cover could have been purchased by participating retrocessionaires. (Starr Aff. Exh. F at 4.) Again, these statements by Canada Life in no way reject the basic understandings between the parties, as Guardian contends; they only contest the level of performance needed to meet such standards. In fact, Canada Life has previously requested that Guardian come forth with proof that such standards had not been met. (*See* Starr Aff. Exh. F at 4.) From the record before this Court, it seems clear that Canada Life believes the basic understandings underlying the 2001 Agreement do apply, but that Guardian has not proved that Canada Life has failed to meet the standards of performance in underwriting and managing risk exposure contemplated by the 2001 Agreement.

Therefore, Guardian's complaints concerning Canada Life's underwriting performance constitute allegations of potential breach, not of failure to come to an agreement. This important distinction was noted in *Proteus Books Limited, v. Cherry Lane Music*, 873 F.2d 502, 508 (2d Cir. 1989). There, the Second Circuit agreed that the standard required to be met by the disputed contract, "due professional skill and competence" was ambiguous and open to interpretation, but that the ambiguity of the standard was wrongly analyzed by the district court as relating to a meeting of the minds: "Although the judge correctly instructed the jury on the question of ambiguity, the charge was erroneous to the extent it discussed a meeting of the minds." *Id.* Rather, the Second Circuit instructed that such amorphous standards are inherently ambiguous and must be properly resolved by the court. *See id.*

Similarly, Canada Life does not dispute that the "good spread of risk" or "disciplined" approach to catastrophe cover standards apply to it. Canada Life merely contends that its performance under the 1999–2001 Agreements met such standards. The extent of Canada Life's obligation concerning underwriting risk and its fulfillment of these obligations are matters of qualitative assessment to be resolved by arbitration. Guardian knew or should have known that these understandings with regard to the propriety of Canada Life's underwriting were potentially ambiguous and open to interpretation as to the standard that had to be met in performing the contract. As *Colfax* instructs, these terms and understandings do not reasonably appear on their face to be unequivocal, but are clearly open to interpretation, which interpretation should not be undertaken by a court when an arbitration clause exists in the parties' the underlying contract. 20 F.3d at 753.

This action can readily be distinguished from *Sphere Drake* and *Interocean*, the two principal cases relied upon by Guardian. (Guardian Mem. at 16–17.) In *Sphere Drake*, the evidence put forth concerned the authority of an agent to enter into the contested agreement, and evidence was presented indicating the manner in which such authority was exceeded. 263 F.3d at 32. However, despite the existence of supporting affidavits (as Guardian seems to suggest is all that is needed) the Second Circuit refused to grant a trial on more than one of the six reinsurance contracts at issue, because, with respect to all but one of the contracts, the affidavits were insufficient to establish a claim. *Id.* at 32–33.

In *Interocean*, negotiations between the parties broke off one week after defendant alleged the agreement was entered into, and the correspondence indicated ambiguity as to whether or not an agreement was ever finalized. 462 F.2d at 675–676. *Interocean* clearly presents a circumstance different from the one at issue in the instant case. Here, the parties had a two-

and-a-half-year course of dealing and certain terms were agreed upon and never previously disputed. Only the meaning of such terms is now in contention.

Therefore, while expressing no view concerning the extent of Guardian's reinsurance participation, or as to Canada Life's fulfillment of its obligations under the contract, the Court determines that the parties' 2001 Agreement does exist. In this case, based on the evidence presented by the parties, it is clear that a contract was entered into and that a certain amount of insurance was contemplated. Since the allegations advanced by Guardian do not establish a claim that the 2001 Agreement was never formed, there is no issue of fact necessitating an expedited trial. Accordingly, the Court is satisfied that the arbitration clause, as part of the 2001 Agreement, is valid and enforceable, and that the appropriate forum for resolution of the contract disputes at issue here is a duly appointed arbitration panel.

## C. AIR TRANSPORTATION SAFETY AND SYSTEM STABILIZATION ACT

Canada Life also argues that in vesting this Court with "original and exclusive" jurisdiction over disputes "resulting from or relating to" the terrorist-related attacks of September 11, 2001, Congress has overridden pre-dispute arbitration clauses such as the one contained in the reinsurance contracts at issue here. ATSA § 408(b)(3). This argument has already been rejected in the context of Guardian's fellow retrocessionaire participants in the same ISA Facilities, *Canada Life Assurance Co. v. Converium Ruckerversicherung [Deutschland] AG*, 210 F.Supp.2d 322, 330 (S.D.N.Y.2002), and in other insurance contexts as well. *See, e.g., International Fine Art and Antique Dealers Show Ltd. v. ASU Int'l, Inc. et. al.*, No. 02 Civ. 534, 2002 WL 1349733 (S.D.N.Y. June 19, 2002); *Combined Ins. Co. of Am. v. Certain Underwriters at Lloyd's London*, No. 01 Civ. 10023, 2002 WL 31056851 (S.D.N.Y. Sept. 13, 2002).

Since *Canada Life Assurance Co. v. Converium Ruckerversicherung [Deutschland] AG* is currently on appeal, and oral argument was heard on August 28, 2002, Canada Life requests that any further briefing on this issue await the Circuit Court's decision. Because the Court will stay further proceedings here and refer this matter for arbitration, Canada Life can delay bringing an action against Guardian in the appropriate arbitral forum, if it so chooses, thereby avoiding making the ATSA issue moot. *Cf. Farr & Co. v. The Punta Alice*, 144 F.Supp. 839, 841 (S.D.N.Y.1956) (issuing a stay of an order to compel arbitration where engaging in arbitration could make the issue on appeal moot). The Court will not decide the issue of the appropriate forum under ATSA at this time, allowing Canada Life to revisit the issue, if the Second Circuit decides in its favor.

## III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the arbitration clause contained in the 2001 reinsurance agreement between Canada Life and Guardian, reduced to writing as Retrocession Placing Slips and referred to herein as the 2001 Agreement, is deemed valid and enforceable; and it is further

**ORDERED** that proceedings in this Court be stayed until such arbitration has been had in accordance with the terms of the 2001 Agreement.

The clerk of the Court is directed to close this case.

**SO ORDERED.**